Eric M. ENOS, et al., Plaintiffs,

v.

John O. MARSH, et al., Defendants.

Civ. No. 82–0571.

United States District Court,
D. Hawaii.

Jan. 5, 1984.

Alan T. Murakami, John Harris Paer, Boyce R. Brown, Jr., Honolulu, Hawaii, for plaintiffs.

Tany S. Hong, Atty. Gen., Randall Y.K. Young, Deputy Atty. Gen., Honolulu, Hawaii, for State of Hawaii, Higashionna & Ono.

Tany S. Hong, Atty. Gen., Annette Y.W. Chock, Deputy Atty. Gen., Honolulu, Hawaii, for Hideto Kono.

Daniel Bent, U.S. Atty., Honolulu, Hawaii, by Carol Muranaka, Asst. U.S. Atty., Honolulu, Hawaii, and Fred R. Disheroon, Washington, D.C., for James G. Watt.

FONG, Chief Judge.

## ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION.

This is an action by certain Waianae Coast residents and various organizations composed of Waianae residents for declaratory and injunctive relief, seeking in the main to stop the construction of the deep draft harbor at Barbers Point. The defendants include the Secretary of the Army, the District Engineer for the Honolulu U.S. Army Engineer District and the State Departments of Transportation, Land and Natural Resources, and Planning and Economic Development.

The plaintiffs allege various violations of the Water Resources Development Act of 1974, at 42 U.S.C. § 1962d–17 (WRDA), the National Environmental Policy Act of 1970, 42 U.S.C. § 4331 *et seq.* (NEPA), the Historic Sites Act of 1935 (HSA), the National Historic Preservation Act of 1966 (HSPA), the Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.* (ESA), certain Corps regulations relating to the failure to monitor cultural resources, 40 C.F.R. 1505.2 and 33 C.F.R. 230.13, and the Coastal Zone Management Act (CZMA).

On December 29, 1982, this court imposed a temporary restraining order enjoining all blasting operations. Plaintiffs' Motion for Preliminary Injunction came before the court for hearing on February 3–5, 1983. The court took the motion under advisement, pending the submission of proposed findings of fact and conclusions of law.

Following the hearing, however, this court found that in light of the evidence presented, there no longer existed a basis for continuation of the temporary restraining order and ordered it dissolved. The Ninth Circuit refused to overturn that decision.

Before this court is a Motion for Preliminary Injunction filed by plaintiffs, seeking to enjoin further construction of the Barbers Point Deep Draft Harbor on the island of Oahu. Plaintiffs' motion is based upon the Water Resources Development Act, the National Environmental Policy Act, and the Endangered Species Act. Plaintiffs have also moved for partial summary judgment on those claims, and seek a permanent injunction based upon these claims.

The federal defendants have filed a Cross Motion for Summary Judgment on all claims.

Also pending are plaintiffs' Motion to Supplement Record, filed August 10, 1983, which is opposed by the state defendants; the state defendants' Motion to Strike the Plaintiffs' late-filed Supplemental Memorandum in Opposition to Defendants Motion for Summary Judgment; and plaintiffs' Motion for Reconsideration of Order Denying Admission of Evidence.

### II. FACTS.

The Barbers Point Deep Draft Harbor Project was authorized by Congress under Section 301 of the Rivers and Harbors Act of 1965. The harbor site is on the southwest ("Leeward") coast of the island of Oahu, in the Ewa District and adjacent to the Waianae District. When completed, it will provide a second deep draft harbor on Oahu for commercial and industrial use.

The principal features of the project will be an entrance channel 4280 feet long, 450 feet wide and 38–42 feet deep, and a 92-acre inner harbor. The project is expected to take about two years for its completion.

The project, as authorized, is the joint responsibility of the United States Army Corps of Engineers and the State of Hawaii, through its Department of Transportation. The Corps is responsible for the construction of the entrance channel and harbor basin. The State of Hawaii will provide, *inter alia*, all lands, easements, rights of way, a portion of the project's costs, and shoreside terminal and transfer facilities.

In 1975, prior to the start of construction, the Corps initiated environmental studies pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, (NEPA). On April 30, 1976 the Corps prepared and circulated a draft Environmental Impact Statement (EIS) for the project. The final EIS was filed on December 27, 1976 and the January 1977 Supplement to the final EIS was filed on February 27, 1977.

The Corps awarded the construction contract to Peter Kiewit Sons Company in March, 1982, pursuant to a court order, and construction commenced in August of that year.

## III. NATIONAL ENVIRONMENTAL POLICY ACT.

### A. *Test for Preliminary Injunction.*

■ In environmental cases, the "preferred"[1] test for granting a preliminary injunction is a tripartite one: (1) whether the movants have established a strong likelihood of success on the merits, (2) whether the balance of irreparable harm favors the movants, and (3) whether the public interest favors granting the injunction. *National Wildlife Federation v. Adams*, 629 F.2d 587, 590 (9th Cir.1980); *Sierra Club v. Hathaway*, 579 F.2d 1162, 1167 (9th Cir. 1978); *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir.1977).

As to the second element, the court in *Friends of the Earth v. Coleman*, 518 F.2d 323 at 330 (9th Cir.1975), has stated in dicta that "irreparable damage may in the context of an action to enforce NEPA be implied from the failure by responsible authorities to evaluate fully the environmental impact of the proposed project, and consider alternative proposals before engaging in a project which constitutes major federal action," although such considerations are not controlling where the movants show little likelihood of prevailing on the merits.

In *Cady v. Morton*, 527 F.2d 786 (9th Cir.1975), the court stated:

> Although failure to comply with NEPA will ordinarily call for an injunction halting the challenged action until the Act's requirements are met, in unusual circumstances an application of traditional equitable principles may justify denial or limitation of injunctive relief."

*Id.* at 798 n. 12.

The Ninth Circuit has recognized that the second and third elements of the tripartate test:

> merge into a single equitable judgment in which the environmental concerns of the movants must be weighed against the societal interests which will be adversely affected by granting the relief requested, a process which must be significantly affected by the realities of the situation.

*Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir.1977). *See also National Wildlife Federation*, 629 F.2d at 590 (affirming the trial court's deni-

---

**1.** In the Ninth Circuit, the courts recognize an alternative test for injunctive relief, a test that for some reason is not utilized in environment cases. Under this test, a party moving for a preliminary injunction must demonstrate either: "(1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These are not separate tests, but the outer reaches of a single continuum." (Citations omitted.) *Los Angeles Memorial Coliseum Com'n v. NFL*, 634 F.2d 1197, 1201 (9th Cir.1980).

al of preliminary injunction on the grounds that appellants had not demonstrated a strong likelihood of success on the merits and that the public interest would suffer far more serious harm if injunctive relief were granted than would the movants if it were not).

In sum, the test for determining whether to grant or deny a preliminary injunction in this case is (1) whether the plaintiffs can demonstrate a strong likelihood of success on the merits and (2) whether the harm to plaintiffs' environmental interests in *denying* the injunction outweighs the harm to the public interest in *granting* the injunction.

In determining whether to issue a preliminary injunction in a NEPA case, an important consideration is the analysis presented in *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). In that case, the issue before the court was a violation of the Federal Water Pollution Control Act. The court found that, although there was a violation of the permit requirements of the Act, an injunction would not automatically issue because there were other provisions to insure compliance, such as fines and criminal penalties.

The court stated that not every violation of a statute would require an injunction, and that the basis for injunction always has been irreparable injury and the inadequacy of legal remedies. A court must therefore generally continue to balance the conveniences to the parties and the possible injuries to them in determining whether to grant injunctive relief.

The court did note that in *TVA v. Hill*, an ESA case, the purposes of the ESA limited the remedies available to the court. Since the ESA contemplated only a ban on destruction of endangered species or their critical habitat, the only relief possible under this act was an injunction. The ESA was contrasted with the Federal Water Pollution Control Act, which did provide other remedies which would equally well serve the purposes of the Act.

There are two ways of looking at NEPA in light of *Romero-Barcelo*. One way is that, like the ESA, NEPA has a single purpose—a purely procedural one. As a procedural statute, there is no way to comply with a violation of NEPA other than to require the agency to follow the specified procedures. When there is a violation of NEPA, therefore, the presumptive remedy is to enjoin the activity of the agency until the procedural requirements are followed.

 This court, however, finds that the proper view of NEPA is that there are *both* procedural and substantive goals of the Act. The substantive goal would be to insure that the decision makers can make an informed choice. Thus, although there may be a technical violation of procedural requirements, an injunction will not necessarily issue if the decision maker is otherwise fully informed as to the environmental consequences of the the proposed action. This view is consistent with *Cady* and *Friends of the Earth, supra*, and with the holding of *Warm Springs v. Gribble*, 621 F.2d 1017 (9th Cir.1980) (failure to give a copy of the draft EIS for comment held not "prejudicial" because there was no indication that the omitted agency would have given the decision maker any useful comment, and because any potential concern of that agency was subsequently considered). *See also, Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

With the above discussion in mind, we turn to the merits of the plaintiffs' claims. The plaintiffs' claims rest on two principal assertions: (1) the 1976 EIS and 1977 Supplement did not adequately consider certain significant environmental effects of the project and (2) defendants failed to file a supplemental EIS on the basis of significant new information which arose after the 1976 EIS and 1977 Supplement.

### B. *The Original EIS.*

NEPA requires federal agencies to prepare and file an environmental impact statement (EIS) for "major federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(2)(C).

The EIS is intended to serve two purposes:

First, it should provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences. Secondly, the impact statement should provide the public with information on the environmental impact of a proposed project as well as encourage public participation in the development of that information.

*Trout Unlimited v. Morton,* 509 F.2d 1276, 1282 (9th Cir.1974).

The appropriate standard for review of the adequacy of an EIS is well established in the Ninth Circuit as that set forth in § 706(2)(D) of the Administrative Procedure Act: whether the EIS was prepared "without observance of procedure required by law." 5 U.S.C. § 706(2)(D) (1976); *Adler v. Lewis,* 675 F.2d 1085, 1096 (9th Cir.1982):

The determination of adequacy is essentially pragmatic. Whether an EIS will be found in compliance with NEPA involves an evaluation of whether the discussion of environmental impacts 'reasonably sets forth sufficient information to enable the *decision-maker to consider the* environmental factors and make a reasoned decision.' ... Preparing an EIS requires the exercise of judgment; however, a court in its review may not substitute its judgment, but instead is limited to ensuring that the *agency* has considered the environmental consequences of its action. (Emphasis in original; citations omitted.)

*Id.* at 1096.

■ In short, the only role for this court in reviewing an EIS is to insure that the Corps has taken a "hard look" at the environmental consequences. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

■ However, an EIS need not discuss remote and highly speculative consequences. A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required. *Trout Unlimited* at 1283. In addition, the sufficiency of an EIS is judged on a pragmatic basis:

Judicial enforcement of NEPA includes strict compliance with the disclosure and procedural provisions of the Act. Nevertheless, the test of EIS adequacy is pragmatic and the document will be examined to see if there has been a good faith attempt to identify and to discuss all forseeable environmental consequences.

*Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 552 (9th Cir.1977).

Plaintiffs allege two deficiencies in the original EIS: (1) the discussion of secondary effects, and (2), the discussion of the state shoreside facilities.

■ (1) *Secondary Effects.* Plaintiffs claim that defendants failed adequately to assess significant secondary effects of the project, i.e., the effects of changes in population patterns and increased urbanization on the applicable resource base of the Waianae coast, including land use, water, and public services, as required by 33 C.F.R. 209.410(i) (1975) and 40 C.F.R. 1500.-8(a)(3)(ii) (1975). Plaintiffs in essence allege that defendants' treatment of significant secondary effects of the project is not adequate under the aforementioned regulations.

The state defendants contend that the regulations cited by plaintiffs merely require that a discussion of significant secondary effects be "included" in the EIS and that a formal study is not required. However, even if a formal study is not required, the regulations require more than mere inclusion. 40 C.F.R. § 1500.8(a)(3)(ii) (1975) states:

secondary or indirect, as well as primary or direct, consequences for the environment should be included in the analysis. Many major Federal actions, particularly those that involve the construction or licensing of infrastructure investments

(e.g. highways, airports, sewer systems, water resource projects, etc.), stimulate or induce secondary effects in the form of associated investments and changed patterns of social and economic activities.... For example, the effects of the proposed action on population and growth may be among the more significant secondary effects. Such population and growth impacts should be estimated if expected to be significant ... and an assesment made of the effect of any possible change in population patterns or growth upon the resource base, including land use, water, and public services of the area in question.

The data to be used in assessing the effect of secondary effects are specified in subsection (a)(1):

In discussing these population aspects, agencies should give consideration to using the rates of growth in the region of the project contained in in the projection compiled for the Water Resources Council by the Bureau of Economic Analysis of the Department of Commerce and the Economic Research Service of the Department of Agriculture (the "OBERS" projection). In any event it is essential that the sources of data used to identify, quantify or evaluate any and all environmental consequences be expressly noted.

Under 33 C.F.R. § 209.410(i) (1975), "the environmental statement is to *fully* discuss the primary and secondary environmental effects including the social and economic impacts." (emphasis added). Indeed, as the court in *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 (9th Cir. 1980) stated, "analysis" of secondary effects is required.

The state defendants attempt to distinguish *Bowers* on the facts, contending that the harbor is not being built in the same area that plaintiffs allege the socio-economic impacts will occur. They state that the harbor is being built at Barbers Point, not in Waianae or Nanakuli. This contention is meritless, as the EIS specifically refers to impacts on "Leeward Oahu". *See e.g.*, EIS §§ 4–7, 4–8, 4–9.

State defendants alternatively urge the court to apply *Citizens Committee Against Interstate Rte. 675 v. Lewis*, 542 F.Supp. 496 (S.D.Ohio 1982). In that case, the court held that an EIS did not need to include a discussion of the economic impacts of a proposed highway upon the adjacent city, where plaintiffs did not allege a primary environmental impact and their claims related only to economic effects. *Id.* at 536–37. The court noted that, unlike the case before it, cases which held that urban impacts were required to be considered "did not discuss NEPA's applicability to situations involving economic impacts only." *Id.* at 536. *Lewis* is not applicable on the issue of secondary impacts in the instant case since, in contrast to *Lewis*, plaintiffs here have alleged significant environmental effects, as well as socio-economic impacts.

Defendants contend that the final EIS adequately considered the significant environmental consequences of the project, including secondary effects, to the extent of the available information.

Included in the EIS is a discussion of the relationship of the proposed harbor development to existing land use plans of the State of Hawaii, the City and County of Honolulu, the Campbell Estate, and the military. EIS § 3. The discussion makes it very clear that the only land areas available for large scale industrial expansion are in leeward Oahu, that the majority of the land on Oahu planned for industrial use is in the leeward area.

As to the secondary impacts on development in the area, the EIS states:

4.30 ... [T]he growth inducing effects of harbor implementation may be significant. The presence of a commercial deep draft harbor will probably hasten the industrial development of the adjacent lands and possibly the urbanization of Leeward Oahu.

4.31 The harbor is primarily intended to serve existing industries, such as the building products industry, which generate or receive commerce in the Ewa-Leeward Oahu area. Growth of leeward

industrial activity is not dependent on the harbor for implementation. Relocation and expansion of existing Oahu industries toward the area is expected with or without the harbor, but the development of new industries around the harbor is not expected because basic industries in Hawaii are population- or service-oriented, rather than export-oriented. Growth in the area should then be commensurate with and complemetary to this population, service-oriented base.

4.32 Growth can be viewed as adverse or beneficial and much of the evaluation will depend on the State and local controls exercised on the development of these lands. The harbor construction will permanently commit the immediate area to major deep draft harbor industrial use and development. On a broader level, it may reinforce the directed growth toward Leeward Oahu, strengthening the case for urbanization on lands which are currently undeveloped or in agricultural use. While the harbor itself will affect only limited acreages of cane lands, the long-range secondary effects on the transition from agriculture to urban uses may be far reaching and will be largely a responsibility of the State and County agencies in exercising the policies and regulations relating to land use.

*Id.*, §§ 4–7, 4–8. The EIS also states:

The proposed harbor development is in consonance with the adopted General Plan of the City and County of Hawaii. A secondary consideration which may be reinforced or hastened is the increased urbanization of leeward Oahu. Urbanization would be subject to the policy direction and controls of both State and local government.

*Id.*, § 8–1.

In response to a specific concern expressed by the Office of Environmental Control of the State of Hawaii regarding the secondary impacts and growth stimulation of the proposed harbor, the EIS stated:

The discussion of secondary impacts has been expanded to the extent possible at this time. Growth in the Ewa area is already underway.... *The harbor is not expected to attract new growth or industry related to harbor activity, but rather to hasten the growth which is expected to take place in the Leeward area, with or without a second port.* Industry in Hawaii is population-oriented, rather than export-oriented, and is expected to grow with the population to meet its need.

The hastening of growth undoubtedly carries significant impacts as well, and identification of major areas of impact such as the need for water supply, sewage facilities, roadway improvements, and the resulting increase in activity in the area will be made as detailed as possible. However, a full evaluation of impacts cannot be made until the State of Hawaii completes acquisition and plans for shoreside facilities.... [A] supplement to the final environmental statement will be prepared and circulated during the detailed design phase. The secondary impacts will be discussed to the extent that the plans of the State are available at that time. Thorough coordination by the State of Hawaii of the shoreside planning with the public and with agencies will assist in the reporting of impacts in the Federal statement or in a State impact statement.

*Id.*, § 9–13.

Again, in response to a concern that the secondary effects of the project were not being considered, the Corps stated:

The details of specific harbor shoreside development plans were not included as they recognized that the shoreside facilities will have a considerable impact on the project area, and for this reason, a supplement to the final environmental statement will be prepared and coordinated later. It should be noted, however, that this DES has been specifically prepared to meet the Federal requirements for a major Federal action significantly affecting the quality of the environment; in this case, construction of a deep draft harbor. It is not intended to meet specific State requirements nor is it intended to

be under Federal guidelines, the decision-making document for the harbor project or for the urbanization of Leeward Oahu. The decision-making document for this Federal project is the project report, the General Design Memorandum, Phase I. (emphasis supplied).

*Id.,* § 9–18.

This court therefore concludes that there has been a sufficient discussion of the secondary effects of the harbor project. In this regard, the instant case is distinguishable from *Bowers, supra.* In *Bowers,* plaintiffs challenged the adequacy of an EIS for a proposed highway project with respect to, *inter alia,* secondary impacts such as growth, land-use development and social and economic activities. The court there found that the EIS failed to address secondary effects, since the discussion of land use was limited only to the following:

This project should not have a significant effect on adjacent land use since the amount of the new Right-of-Way being taken is quite small and the existing access patterns will be left about the same as they are now. Although several businesses and homes ... will have to be relocated, it is expected that they will try to relocate as near to the new highway as possible. *Since this project will provide a new 4-lane facility, the possibility does exist that development along the highway may increase at a faster rate than it has in the past.* (emphasis added)

*Id.* at 782.

In addition to other grounds, the court in *Bowers* found the EIS to be deficient on the issue of secondary impacts. The court reversed and remanded the case to the district court with instructions to enjoin construction until defendants could demonstrate full compliance with NEPA.

*Bowers* is distinguishable from the instant case, because the defendants in that case had virtually ignored secondary impacts in the EIS. In the instant case, the final EIS contains repeated discussion of the potential secondary impacts of the project development, sufficient to place the decision makers on notice of such effects of the harbor project.

Of course, the discussion of possible effects on leeward Oahu were necessarily speculative and could only be discussed in relatively general terms, since the construction of the harbor itself would have very little secondary impact on the leeward Oahu area. A more detailed discussion of such impacts would have to await the state's plans for the shoreside facilities, and the various zoning changes in the area.

The case of *Concerned Citizens v. Sec. of Transportation,* 641 F.2d 1 (1st Cir. 1981) is controlling here. In *Concerned Citizens,* appellants challenged the adequacy of the EIS' discussion of the impact of secondary development from a highway project. The EIS stated:

[T]he significance of [secondary development] will depend on its amount, quality, and the ability of the community or region to channel such growth positively in accord with its goals.

[S]uch growth and development can be most beneficial when accompanied by good land in control [sic]. Positive or beneficial effects would include new desirable growth that would be induced by the proposed expressway.

641 F.2d at 5.

Said the court:

[W]e appreciate appellants' concerns ... that the EIS underplays the possibility of adverse effects of secondary development.... But in this case we agree with the district court that 'the highly speculative nature of the [projected] growth' and 'the existence of continuing opportunities to limit its adverse effects' renders the disclosure in this case at least minimally acceptable.

*Id.* at 6. The court ultimately affirmed the district court's denial of a preliminary injunction.

Also relevant is *Concerned Citizens v. Goldschmidt,* 533 F.Supp. 1222 (D.New Jersey 1982):

where the alleged impact of future development is speculative at the time of the

FEIS, a failure exhaustively to examine future trends does not render the FEIS inadequate.... Moreover, as recognized by the court in *Concerned Citizens,* secondary development is controllable by local authorities through land use controls. (citations omitted)

533 F.Supp. at 1231.

In the instant case, the EIS makes it clear that the potential effects of the harbor project itself was relatively small, but could be significant when viewed in conjunction with the state's shoreside facilities. Much of the growth potential, however, would be dependent upon the controls placed by the state and local governments. With so much contingent upon as yet unknown factors, it is problematical as to how much further any analysis could be meaningfully taken. *See, Cummington Preservation Comm. v. Federal Aviation Adm.,* 524 F.2d 241, 244 (1st Cir.1975), (cited with approval in *Concerned Citizens, supra,* 641 F.2d at 5).

Thus, the highly speculative nature of the potential effects and ability of state and local authorities to limit (e.g. through zoning classifications) such effects should, as in the *Concerned Citizens* case, render the EIS at least "minimally acceptable". In this regard, it is significant that, eight months after the completion of the final EIS, the state had yet only completed a "preliminary conceptual plan of the harbor shoreside facilities". Defendant's Exhibit 9, B–1.

The standard of review of an EIS is whether the statement was prepared "without observance of procedure required by law". *Trout Unlimited v. Morton,* 509 F.2d 1276 (9th Cir.1974). An EIS will be found to be in compliance with NEPA when:

> its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed

project's environmental impact and encourage public participation in the development of that information.

*Trout, supra,* 509 F.2d at 1283.

In the instant case, it is clear that the EIS, when viewed as a whole, adequately disclosed the potential impacts of the harbor project, given the information then in hand, and gave the decision makers enough information so that an intelligent decision could be made as to whether to proceed with the project at that time. It also sufficiently highlighted the potential problems so as to encourage public participation in the development of further information.

Moreover, the decision whether to proceed with a project (as opposed to the procedural requirements of NEPA), is judged by the "arbitrary and capricious" standard:

> Judicial review of the adequacy of an EIS is also circumscribed. The substantive decision whether to proceed with a project is committed to the executive and legislative branches of government with which the judiciary will not interfere in the absence of a showing that the choice was "arbitrary and capricious," given the known environmental consequences.

*Warm Springs Dam Task Force, supra,* 565 F.2d at 552.

This court can find no basis to conclude that the decision to proceed with the harbor project, despite a lack of detailed information on the shoreside facilities sufficient to discuss more expansively the possible secondary effects, was either arbitrary or capricious.

■ (2) *Shoreside facilities.* Plaintiffs also allege that the 1976 final EIS and 1977 Supplement failed to discuss the impacts of the State-funded shoreside facilities, which they allege are closely intertwined with the harbor project.

■ NEPA requires federal agencies to provide a detailed environmental impact statement for "major Federal actions significantly affecting the human environment." 42 U.S.C. § 4332(2)(C). Thus, for an action to be subject to NEPA, it must be

shown to be "federal". *Friends of the Earth v. Coleman,* 518 F.2d at 327.

In the instant case, plaintiffs argue that the shoreside facilities, although entirely funded by the state, should be considered as part of the harbor project for NEPA purposes. They contend that the state could not proceed on the shoreside facilities without federal funding for the harbor since the facilities would be useless without the harbor.

This court is not convinced that the shoreside facilities and the harbor itself are so "functionally interdependent" that they must both be considered as a single "federal action" for NEPA purposes. The harbor project, after all, did proceed without the finalization of the state's plans for the shoreside facilities, and the size and scope of the shoreside facilities are not dependent upon the harbor itself. The instant situation is less like the sectioning of a highway into federal and non-federal portions to avoid the requirements of NEPA, and more like the situation in *Friends of the Earth, supra,* wherein the Ninth Circuit found that the federal government's program for airport development was not so functionally interdependent with the state's plans to build a terminal and a parking garage, despite a "substantial functional complementarity" between the federal and local projects. 518 F.2d at 329.

In addition, this court can find nothing wrong in the failure to consider the shoreside facilities in the EIS when there was yet no detailed plan for such facilities. As noted before, the decision makers have elected to proceed with the harbor project without waiting for the state to finalize its plans for the shoreside facilities, and this court will not disturb that decision to proceed absent some showing that said decision was arbitrary and capricious. *Warm Springs Dam Task Force, supra; Jicarilla Apache Tribe v. Morton,* 471 F.2d 1275 (9th Cir.1973).

Finally, this court notes that the State of Hawaii also prepared an EIS in September, 1978. The state's EIS contains discussions of the harbor development's anticipated ef-

fect upon land values in the industrial park, the probability of businesses relocating to the harbor area, impact upon the job market, secondary physical and social impacts, and affect upon population growth. In this regard, it is significant that the state's EIS concludes that a sizable increase in the area's population would be expected even without a harbor, as a result of governmental encouragement, favorable land use changes, and the lack of residential space in Honolulu. The Ewa plain population is projected to increase by only 1.5 percent due to the harbor itself. *See* Federal Defendants' Exhibit 14, III–56—III–57.

In addition, although the harbor is expected to contribute to the urbanization of leeward Oahu, the state's general plan already calls for directing a substantial portion of Oahu's population and economic growth toward the Ewa district. The state's EIS notes that governmental land use policies and decisions will influence the rate and trends of development. *Id.,* III–63.

In balancing the equities, it is significant that the secondary effects of the harbor project has been extensively discussed in the state EIS. As stated in *Friends of the Earth, supra:*

> the formal environmental review of the state construction projects is a factor in determining whether these projects should be halted.

518 F.2d at 330.

C. *Laches.*

■ Defendants for some reason have throughout these proceedings continued to insist that plaintiffs' claims are barred by laches. This issue was resolved long ago, however, at the previous hearing on defendants' Motion to Dismiss. There, this court held that *Bowers* was dispositive of this point.

Defendants argue that plaintiffs are lacking in diligence, as evidenced by the fact that the final EIS was filed in 1976 and the complaint was not filed until 1982. In evaluating a party's diligence, the factors to be considered include:

(1) whether plaintiff has made an attempt to make his postion known to the agency before the filing of suit; (2) the agency response to the request; and (3) developments such as preparatory construction that tend to motivate citizens to investigate the legal bases for challenging the agency action.

*Id.* at 779. *See also, Preservation Coalition Inc. v. Pierce,* 667 F.2d 851, 854 (9th Cir.1982).

Plaintiffs contend that notice of opposition to the project was given to the defendants in 1977; that several of the plaintiffs filed suits challenging land use decisions allowing the project to proceed; and that several defendants testified at public hearings. The complaint was filed eight weeks after groundbreaking.

In applying *Bowers,* this court has previously held that the defendants had failed to show that plaintiffs lacked diligence. The present record instead shows sufficient diligence on the part of the plaintiffs in presenting their claims—they gave notice to federal defendants of their opposition to the project in 1977, they filed various suits, participated in public hearings, and filed the instant suit only eight weeks after groundbreaking.

Defendants contend that they are prejudiced, because they are now actively engaged in construction and will incur substantial losses if the project is halted. As before, this court has already held that defendants failed to demonstrate any prejudice. Increased cost due to delay is, under *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851 (9th Cir.1982) and *Bowers* insufficient by itself to support a showing of prejudice.

Moreover, the Ninth Circuit has consistently recognized that laches is not a favored defense in environmental cases. *Bowers* at 779; *See also, City of Davis v. Coleman,* 521 F.2d 661, 678 (9th Cir.1975) ("to make faithful execution of this duty contingent upon the vigilance and diligence of particular environmental plaintiffs would encourage attempts by agencies to evade their important responsibilities. It is

up to the agency, not the public, to ensure compliance with NEPA in the first instance.")

### D. *Supplemental EIS.*

■ Plaintiffs contend that defendants were required to prepare and file a supplemental EIS on the basis of significant new information which arose after the 1976 EIS and 1977 Supplement were filed.

Under 40 C.F.R. § 1502.9(c) (1981), the Corps must prepare such a supplement if it "makes substantial changes in the proposed action that are relevant to environmental concerns or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

The standard of review on this issue is one of reasonableness; an agency's decision not to supplement an EIS in light of new information will be upheld only if it is reasonable:

When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures. Reasonableness depends on such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.

*Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1024 (9th Cir.1980).

In *Warm Springs,* the court examined plaintiff's contention that significant new information, which put into question a proposed dam's ability to withstand earthquakes, required a supplemental EIS. The court found that, although the information was not so definitive as to compel initiation of formal supplementation it raised "sufficient environmental concerns to require the Corps to take another hard look at the

issues." *Id.* Following receipt of the information, the Corps had launched an extensive study, the results of which were reviewed and affirmed by various authorities. The court found that on the basis of the studies and reviews, the Corps could reasonably conclude that the new information was not significant, and therefore did not require the preparation of a supplemental EIS.

Under *Warm Springs,* if the new information is not necessarily definitive so as to compel formal supplementation, it must at least raise sufficient environmental concerns in order to warrant a "hard look." Should that hard look reveal, as it did in *Warm Springs,* that the information is not significant, then a supplemental EIS would not be required.

Plaintiffs argue that there has been other significant new information since the filing of the 1976 EIS and the 1977 supplement which necessitates the filing of another supplement.

(1) *Population projections.* 40 C.F.R. § 1500.8(a)(1) requires agencies to "identify, as appropriate, population and growth characteristics of the affected area and any population growth and growth assumptions used to justify the project or program or to determine secondary population or growth impacts resulting from the proposed action and its alternatives".

The 1976 EIS relied on the population projections issued by the State Department of Planning and Economic Development (DPED) in 1974. However, in 1978 the DPED issued revised population projections for the year 2000, which are 20% less than those used in the EIS. Plaintiffs claim that defendants failed to supplement the EIS on the basis of the projected decline in the Oahu population projections from 1,039,000 persons to 917,400 for the year 2000. They allege that such failure gives undue weight to the need for the harbor, through inflated estimations for shipping demand and the level of economic benefits. Plaintiffs rely on the 1979 "Evaluation of Barbers Point Deep Draft Harbor" prepared by the DPED, which states

in pertinent part: "The project justification uses unrealistic and obsolete population and economic growth projections characteristic of the 1960's and early 1970's resulting in exaggerated projections of waterborne cargo." *Id.* at 2.

Plaintiffs should keep in mind that, a supplemental EIS is required only when the new circumstances are "relevant to environmental concerns". 40 C.F.R. § 1502.-9(c). This court finds that the revised population projections, relate at most only to the *need* for the harbor, and thus does not raise any environmental concerns sufficient to require the Corps to even take a "hard look" at the information.

(2) *Archeological discoveries.* Plaintiffs further argue that archaeological and paleontological survey work revealed considerable cultural deposits that were not previously identified or adequately incorporated in the EIS.

Sometime after the filing of the 1976 EIS and the 1977 Supplement, the Corps commissioned an archaeological and paleontological study. This study was part of the Corps' data recovery project designed to mitigate the effects of the construction on the archaeological sites in the particular area to be affected by the next phase of construction activity. As more fully discussed in the section of this opinion dealing with the National Historic Preservation Act, the Corps' plans for the data recovery project had already been approved by the Advisory Council on Historic Preservation.

The final report, "Archaeological and Paleontological Investigation at Kalaeloa (Barbers Point), Hono'uli'uli, Ewa, O'ahu" (Federal Defendants' Exhibit 29e), sometimes referred to as the Hammatt/Folk report, concluded that further investigation would be unnecessary and that none of the sites were appropriate for preservation. It recommended complete archaeological clearance for the entire project area. *Id.* at 28.

After certain revisions were made to the report at the request of the Advisory Council, the Advisory Council noted that it had

"no major objection" to the report, but recommended peer review of the study. On the record are four such reviews, all of which are highly critical of the report. *See* Federal Defendants' Exhibit 29a, Letter from the Advisory Council (November 27, 1981).

Plaintiffs rely on *Aluli v. Brown*, 437 F.Supp. 602, 606 (D.Hawaii 1977), *rev'd in part on other grounds*, 602 F.2d 876 (9th Cir.1979), where the court found that the discovery of 92 archaelogical sites since the filing of the original EIS made the filing of a new or revised EIS imperative. The *discovery* of new sites, however, is distinguishable from conflicting scientific opinions on the *significance* of particular archaeological sites.

Thus, defendants properly point out that mere disagreement among experts will not invalidate an EIS. *Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir.1973), *cert. den.*, 416 U.S. 461, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). In *Life of the Land*, the EIS being challenged had utilized four scientific studies and concluded that an airport reef runway project would result in improved water quality in the adjacent marine area. At trial, the plaintiffs introduced letters which questioned certain data and conclusions relied upon in the preparation of the EIS' water quality analysis. Said the court:

> Apart from the obvious observation that the letter writers were, for the most part, not available for cross-examination, we note that disagreement among experts will not serve to invalidate an EIS. Indeed, 'further studies, evaluation and analyses by experts are almost certain to reveal inadequacies or deficiencies'.... The [EIS] need not achieve scientific unanimity on the desirability of proceeding with the proposed action. (Citations omitted)

485 F.2d at 472–73.

In addition, as more fully discussed in connection with the National Historic Preservation Act below, the Corps has, for each phase of construction which would affect archaeological sites eligible for inclusion in the Historic Register, made a determination of "no adverse effect" as to each area to be affected by the construction. These determinations have been concurred in by both the State Historic Preservation Officer and the Advisory Council on Historic Preservation. Given these determinations, which this court can in no way find to be either arbitrary or capricious, there is nothing to justify a conclusion that sufficient environmental concerns have been raised such as to require a supplemental EIS.

Moreover, the discovery of additional sites since the filing of the original EIS is not significant in itself. As discussed below, the sites are neither unique nor unusual in Hawaii, and that their significance lies primarily in their research potential, which potential can be achieved by salvage of data from the sites prior to construction. *See* Federal Defendants' Exhibit 9. The Corps and the State Historic Preservation Officer have twice concluded that in-place preservation of the sites would not be necessary. Federal Defendants' Exhibit 29a. Under these circumstances, this court cannot find that a supplemental EIS would be required.

(3) *Impact on lifestyles.* Plaintiffs argue that the impacts on lifestyles, fishing and the unique character of the Waianae Coast should have been evaluated in a supplemental EIS following the adoption of the Oahu General Plan in 1977 and the State Plan in 1978. In support of their position, they cite to a report prepared in 1980 by the City and County of Honolulu, entitled "Evaluation of Barbers Point Deep Draft Harbor" (Plaintiffs' Exhibit 49).

The thrust of the Evaluation, is that "the harbor would adversely impact the economy of Oahu and would irreversibly and adversely impact the pattern and sequencing of urban development of Honolulu, Hawaii's major city." Plaintiffs' Exhibit 49, at 1. Although the 1976 EIS states that the project is consistent with the then existing Hawaii State Plan and Oahu General Plan, the Evaluation, concludes that the project "will conflict with both the subsequently adopted [1978] State Plan and the

[1977] General Plan of the City and County that call for compact, orderly, energy efficient urban growth." *Id.* at 4.

This court fails to see how either the Evaluation, the changes to the State and General plans, or the changes in the population projections raise sufficient environmental concerns such that a supplemental EIS would be required. The intent of NEPA is to assure an intelligent evaluation of a federal project's effect upon the human environment. *See, Trout Unlimited, supra.* Changes in factors which at most affect only the need or desirability of the project are not relevant to the analysis.

The Evaluation, the changes to the plans and the changes in projected population growth all relate only to the need for the harbor. They will in no way affect the impact of the harbor itself upon the environment. This court finds, therefore, that those changes did not require a supplemental EIS.

(4) *Changes in disposal sites.* Plaintiffs allege that the state's changes in size and location of the disposal areas for stockpiled dredged coral necessitated consideration in a supplemental EIS of the dust, pollution and water needs effects. Defendants respond that more than speculation is necessary before the court can determine the need for a supplemental EIS, and plaintiffs have not made any showing that they are likely to succeed on the merits of this claim.

This court finds that the above changes were in fact considered in the Corps' 1983 Environmental Assessment and were determined to have an insignificant and short-term impact. Therefore, even assuming that these changes raised sufficient environmental concerns, the Corps took the requisite "hard look" and concluded that the changes were not significant. There is nothing in the record which would allow this court to conclude that this conclusion was unreasonable.

(5) *Changes in construction techniques.* Plaintiffs allege that changes in construction plans, i.e., the widening of the existing entrance channel, caused increased turbidi-ty and sedimentation not contemplated in the EIS. Defendants properly argue that plaintiffs have failed to make any evidentiary showing on this point.

Plaintiffs rely on aerial photos showing plumes of sediment escaping the mouth of the harbor basin. However, the person who took those photos, Sherwood Maynard, testified that he did not know whether any dredging was going on at the time he took the photographs. The AECOS study (Plaintiffs' Exhibit 19) indicates that either prevailing weather and sea conditions, or barge activity in the harbor, can result in high turbidity conditions absent any dredging activity. AECOS Study, p. 7, 13. In fact, the AECOS study shows that some of the highest NTU readings, taken at the mouth of the harbor, occurred when there was no harbor dredging. *Id.* at 7. Thus, on the record before the court, plaintiffs have completely failed to show that the widening of the existing entrance channel raised sufficient environmental concerns to warrant a hard look.

(6) *Blasting.* Plaintiffs argue that blasting, which was not contemplated in the original 1976 EIS, has resulted in damage to coral reefs, killing of fish, structural damage to nearby homes, mental anxiety to occupants of those homes, and currently unknown effects on humpback whales (an endangered species), green sea turtles (a threatened species) and porpoises.

The use of both onshore and offshore blasting was considered by the Corps in the 1983 Environmental Assessment, which concluded that there "will be no blasting activities which would result in significant adverse impact to marine life, water quality, and the terrestrial environment". Plaintiffs' Exhibit 22, p. 20. According to the testimony of John Maragos, who assisted in the preparation of the Assessment, this conclusion was supported by tests, monitoring and observations conducted by the Corps. Thus, defendants contend that the Corps reasonably concluded in its 1983 Environmental Assessment that blasting would not have any significant effects, and

therefore did not warrant the preparation of a supplemental EIS.

Plaintiffs have failed to show that this conclusion was unreasonable. As to *offshore* blasting, there is no evidence on the record that such blasting will result in any further significant effect upon the coral reefs beyond that caused by the recent hurricane Iwa. Also, there is undisputed testimony that the species and overall number of fish affected by offshore blasting are not significant. It was for these reasons, in fact, that this court lifted the TRO earlier imposed on the blasting activities at the project site.

In addition, the only alleged significant effect of *onshore* blasting is structural damage to houses in the adjacent residential area. The court was not convinced that the alleged damage is within the zone of interest protected by NEPA. *See Cobble Hill Assn. v. Adams*, 470 F.Supp. 1077 (E.D.N.Y.1979). Moreover, the only conclusive evidence on the record of the effects of onshore blasting are the seismograph studies conducted at the behest of the Corps in the adjacent residential area, which concluded that vibrations were well below established safety levels. A.S. Furumoto & Assoc. Report at 9–10.

There is therefore nothing in the record to conclude that the Corps' decision not to file a supplemental EIS on the effects of blasting was unreasonable, arbitrary or capricious.

(7) *Change to Auger and Clamshell method.* Plaintiffs contend that the change in dredging techniques from the hydraulic cutterhead to the auger and clamshell, was a significant change which may affect the environmental consequences of the project.

The 1976 EIS and 1977 Supplement specified the use of the hydraulic cutterhead method for dredging the basin and entrance channel of the harbor. During the development of the plans and specifications however, the Corps decided to implement a water quality standard rather than specifying a cutterhead dredge method, on the grounds that the latter was anticompeti-

tive. Peter Kiewit Sons, who obtained the contract as a result of a court order, proposed utilizing a combination auger and clamshell method of dredging.

Plaintiffs contend that the conclusion is baseless as defendants have not conducted any tests by which to form a basis for predicting effects from the auger and clamshell operations. Plaintiffs argue that past studies indicate that the clamshell operation will "probably" result in higher turbidity levels than would the hydraulic cutterhead method. Plaintiffs' cited exhibits, however, do not support this proposition.

Plaintiffs further contend that the turbidity measurements taken at the project site have often exceeded state water quality standards, and that excessive turbidity if prolonged can kill or adversely affect coral reefs. As noted before, however, many of these high readings are the result of wave and weather conditions, or the activity of barges in the harbor, and not from dredging. In any event, there is nothing in the record to suggest that the readings obtained would have differed if the original cutterhead/suction method was used.

As noted in the Environmental Assessment, the cutterhead method of dredging would grind nearly 100% of the material to be removed, although much of the sediment would then be sucked up. The effectiveness of the suction would be reduced by such factors as pumping rates, cutterhead rotation rates, leaks in the pipeline, backflushing, and other problems. Augering, on the other hand, would break up less than 30% of the material to be removed, although the clamshell would permit more sediment to escape. Plaintiffs' Exhibit 22, p. 16.

On balance, the Corps concluded that there was no clear difference between the effects of the two dredging methods. *Id.* at 17. To mitigate adverse impacts, the Corps established and incorporated in the project plans and specifications, a turbidity control standard which would be applicable to any dredging method used. The Assessment states that "enforcing and monitoring

the water quality conditions during open water construction operations should insure that impacts attributed to clamshell/auger dredging above that anticipated for hydraulic cutterhead dredging will be avoided." *Id.* at 18. There is nothing in the record to suggest that these conclusions were unreasonable, arbitrary or capricious.

### E. *Applying the Test for Preliminary Injunction.*

■ Both sides invoke the public interest in support of their position. Defendants invoke the public interest based on Congress' decision to proceed with the project. Plaintiffs contend that Congress has recognized that enforcing NEPA is in the public interest.

Defendants also contend that an injunction would cost the public an estimated $55,000 per day for suspension of work and would delay public receipt of the benefits of the harbor. Their reliance on *Committee for Charter Protection for Parks v. Weinberger,* 16 E.R.C. 1433 (S.D.Cal. September 2, 1981) and *Rental Equipment Co. v. Meridian Engineering,* 374 F.Supp. 892 (D.St.Croix 1974) however, is misplaced. *Rental Equipment* is inapplicable because environmental interests were not at stake in that case. *Weinberger* involved construction of a hospital, where the court found that in addition to the cost escalation factor of $20,000 per day for any delay, 400,000 people would be deprived of the hospital's services during that time. These interests were found by the court to outweigh plaintiff's environmental interests.

In the instant case, this court finds, first of all, that the plaintiffs have not established a strong likelihood of success on the merits. In addition, the plaintiffs have raised few *environmental* concerns of much substance. Although increased cost from delay alone is usually not sufficient to establish prejudice, *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851 (9th Cir. 1982), when the plaintiffs' environmental concerns are balanced against the costs to the project for any delay, this court must find that the equities weigh in the favor of defendants. Accordingly, this court will decline to grant injunctive relief.

### IV. *WATER RESOURCES DEVELOPMENT ACT.*

Under the WRDA and the regulations promulgated thereunder, the Corps is required in its cost-benefit computations to use a current discount rate determined by a formula and published by the Water Resources Council. 42 U.S.C. § 1962d–17(b); 18 C.F.R. § 704.39. However, for projects authorized by Congress prior to January 3, 1969 (as was the instant project) the Corps is allowed to use a $3\frac{1}{4}\%$ rate when the appropriate non-federal agencies have, prior to December 31, 1969, given "satisfactory assurances" to pay the required non-federal share of the project costs. *Id.*

Plaintiffs argue that the Corps violated the WRDA by using the $3\frac{1}{4}\%$ discount rate without first obtaining such "satisfactory assurances" from the State of Hawaii to pay its share of the project's costs. Plaintiffs claim that no such assurances could have been obtained.

This court has previously held that the plaintiffs are not entitled to an injunction, preliminary or otherwise, against any construction of the deep draft harbor on the basis of the Water Resources Development Act ("WRDA"). The cases of *Izaak Walton League of America v. Marsh,* 655 F.2d 346 (D.C.Cir.1981); and *Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774 (9th Cir.1980), cited by both the plaintiffs and the federal defendants, make it very clear that such injunctive relief is not an appropriate remedy for a violation of the WRDA, and that plaintiffs at most are entitled only to an order requiring the Corps to use the appropriate discount rate in the preparation of their cost benefit analysis.

Plaintiffs' reliance upon *Environmental Defense Fund v. Marsh,* 651 F.2d 983 (5th Cir.1981) is misplaced. In that case, the court granted only prospective relief, noting that its holding was limited by the rule that congressional action based upon a spe-

cific cost-benefit analysis forecloses judicial review thereof. Thus, it could not order the Corps to correct past submissions to Congress, but it could and did order the Corps to cease using the inappropriate discount rate for all future computations.

Plaintiffs again rely principally upon *Environmental Defense Fund v. Marsh,* 651 F.2d 983 (5th Cir.1981). In that case, the court considered a project which, like the deep draft harbor project in the instant case, was eligible to use the 3¼% discount rate provided satisfactory assurances were given by the state. The defendants argued that the question of whether satisfactory assurances were given is a matter committed to the discretion of the agency and is thus unreviewable by the court. They relied upon § 701 of the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), which excludes from judicial review any actions that are "committed to agency discretion by law".

The *Marsh* court rejected this argument, noting that it can review at least whether some responsible official had in fact fulfilled his statutory duty to decide that the local assurances were satisfactory. In addition, the "agency discretion" exception is a narrow one, and is limited only to those situations where the statutes are drawn in such broad terms that in a given case there is no law to apply. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820-21, 28 L.Ed.2d 136 (1971). Because the Corps did enact an internal regulation which determined the adequacy of local assurances, the *Marsh* court held that this regulation established a "law to apply".

In *Marsh,* it was undisputed that the Corps did not comply with the specific requirements of the regulation. As a result, the court held that the Corps was not entitled to use the 3¼% rate in any future cost benefit analysis. Moreover, because the record contained no evidence at all that any Corps official made the specific determination that the local assurances were "satisfactory", the court held that, regardless of the regulation, the Corps did not even comply with the broader legal requirements of § 1962d–17(b) itself. *Id.* at 1004–05. Remedial action was no longer possible, since the assurances had to have been given before December 31, 1969. Thus, the court ordered the Corps to cease using the 3¼% exemption and to use the normal discount rates in all future cost benefit computations.

The regulation considered by the court in *EDF v. Marsh* is the same in all relevant respects as that presented in the instant case:

> The determination of the sufficiency of assurances rests with the Division or District Engineer. It is, therefore, essential that the legal authority of the local agency be thoroughly investigated, and that a firm determination be made that the agency has full legal authority, under local laws, to give the assurances. It must also be established to the satisfaction of the Division or District Engineer that the local agency is financially responsible for the fulfillment of all required local cooperation. Finally, the written assurances must be in strict compliance with the pertinent act of Congress, and the instrument or instruments constituting the assurances must be legally sufficient.

Engineer Regulation 405–2–680, ¶ 4.b.

The federal defendants first argue that the interest rate used is not a proper matter for judicial review. They argue that if the overall determination of the costs and benefits of a project are not reviewable, then a portion of that analysis is similarly unreviewable.

The problem with the defendants' position is that they can cite to no case law in support of this theory, and the only case on point, *EDF v. Marsh,* is directly contrary to this position. Defendants' logic would also make little sense. Just because the ultimate determination is a matter reserved to the legislative or administrative branches, it does not follow that a court cannot require that the information used in connection with this determination be obtained in the form and manner prescribed by law.

This is, in fact, precisely what a court does in a NEPA case.

Assuming that ER 405–2–680 applies to determine the sufficiency of the assurances given by the State of Hawaii, the plaintiffs then argue that the state could not have given the quality of assurances of cooperation required, because 1) the Corps did not follow the investigation requirements of ER 405–2–680, 2) the written assurances were inadequate, and 3) it was legally impossible to give the required assurances.

 The critical question, as this court sees it, is whether ER 405–2–608 should apply to determine the sufficiency of assurances of local cooperation under the WRDA. Plaintiffs urge that *EDF v. Marsh* controls this question. The state defendants urge that the *Marsh* court was simply confused because there is no connection between ER 405–2–680 and the WRDA.

The regulation (promulgated on June 16, 1967) predates the WRDA by at least seven years. The *Marsh* court had held that it was improper for the district court to use a definition of "satisfactory assurances" found in a very old statute which was related to a specific water project, and to apply this definition to the WRDA, a general statute enacted some 30 years later. The court found that there was no connection between the two statutes. The state defendants argue that, under its own logic, the *Marsh* court should not have applied the earlier promulgated Engineer Regulation to the WRDA.

The state defendants completely misread *Marsh*. The earlier statute was found to be inapplicable to the WRDA in *Marsh* because there was no evidence that Congress intended the older statute, relating to a specific project, would have any application to the WRDA, a general statute.

ER 405–2–680, even though earlier in time than the WRDA, was found to be applicable not because the *Marsh* court divined a Congressional intent that it be applicable, but because the Corps should be bound by its own regulations. These regulations clearly contained requirements relating to determining the sufficiency of local assurances, and were in force at the time the local assurances were sought.

The federal defendants argue that ER 405–2–680 applies only to the acquisition of real estate by the local agency. This argument is easily disposed of. Paragraph 6 of ER 1150–2–301, promulgated on September 1, 1967 (Exhibit J to plaintiffs' Supplemental Memorandum in Support of Motion for Partial Summary Judgment and/or Permanent Injunction), makes it clear that the requirements of ER 405–2–680 are applicable to "all elements of the Corps of Engineers performing Civil Works functions with regard to the construction of projects which require local cooperation". ER 1150–2–301, ¶ 1.

In determining the question of whether ER 405–2–680 should be applied to the WRDA, this court first notes that *EDF v. Marsh* is distinguishable on the facts from the instant case. The court there found that the Corps did not even comply with the broader legal requirements of § 1962d–17(b) because there was no evidence that any responsible Corps official had in fact fulfilled his duty to decide that the assurances were "satisfactory". Thus, it was not necessary for the court to even reach the question of whether ER 405–2–680 applied.

The Fifth Circuit's finding that ER 405–2–680 is applicable to the WRDA is therefore somewhat superfluous, and to that extent can be treated as gratuitous dicta. This court has carefully reviewed the authorities cited by the parties, and, with all due respect to the Fifth Circuit, concludes that ER 405–2–680 cannot be applied to determine the sufficiency of local assurances required under the WRDA.

The River and Harbor Act of 1965 (Title III of Public Law 89–298) (Defendants' Exhibit 3) authorized the Barbers Point Deep Draft Harbor project, "subject to" the conditions specified in House Document No. 93, 89th Congress (Defendant's Exhibit 2). Under House Document No. 93, the state was required to:

1. Provide, without cost to the United States, all lands, easements, and rights of way required for the construction and maintenance of the harbor project.

2. Hold and save the United States harmless from damages resulting from the construction and maintenance of the project.

3. Provide and maintain adequate new terminals and transfer facilities.

4. Provide and maintain berthing areas.

5. Accomplish such utility, drainage and other relocations or alterations necessary for project purposes.

6. Contribute a percentage of certain construction costs, then estimated to be $224,000.

7. Provide suitable access roadway, mooring installations and utilities.

(*See* Defendants' Exhibit 2, p. 72.)

House Document No. 93 is a report of the Army Corps of Engineers regarding the project. The body of the report was prepared as early as May 4, 1964, and shows that the required local assurances were already received to the satisfaction of the District Engineer:

> The State of Hawaii's Department of Transportation has assured the District Engineer that, as the cooperating agency of the State, it is willing to fulfill the requirements of local cooperation enumerated above and desires to undertake the projects upon Federal authorization and funding. In previous navigation projects with the Federal Government the State has more than met all requirements of local cooperation, and it is the opinion of the District Engineer that the State can and will meet the required terms of local cooperation.

Defendants' Exhibit 2, p. 73. This statement appears to reflect the fact that, at least by October 24, 1963, the State of Hawaii had repeated in writing its assurances that it would fulfill its obligations:

> We wish to reiterate our endorsement of [the Barbers Point project] and assure you that the State is willing to fulfill the requirements of local cooperation.

Defendants' Exhibit 1 at Appendix C–3, Letter from the state's Department of Transportation to the Corps' District Engineer (October 24, 1963). This position was again affirmed by a letter dated August 13, 1964 from the State Department of Transportation to the Chief of Engineers:

> As stated in our letter HAR 825 of October 24, 1963, the State indorses ... the construction of a new deep water harbor and a harbor for light draft vessels at Barbers Point. [These] projects are vital to the economic development of the State and the State is willing to fulfill all the specified requirements of local cooperation.

Exhibit D to State defendants' Memorandum in Opposition to plaintiffs' Motion for Partial Summary Judgment and/or Permanent Injunction.

In reliance on House Document No. 93, the Congress in Public Law 89–298, dated October 27, 1965 authorized the Barbers Point project. Subsequent to this, on December 24, 1968, the Water Resources Council issued a Regulation establishing the new procedure for determining the interest rate for computing the cost and benefits of a project. 18 C.F.R. § 704.39 (1965). The 3¼% interest rate could be used for projects authorized before the close of the 90th Congress (as was the instant project) and wherein satisfactory local assurances were given before December 31, 1969.

As a result of this new Regulation, the Corps on February 3, 1969 issued a memorandum to its divisions describing the new Regulation. Although the Regulations specifically required satisfactory assurances only as to the non-federal share of *project costs*, the 1969 memorandum stated that the requirement would be "construed to apply to *any* item of local cooperation for which formal assurances would normally be obtained prior to initiation of construction". Defendants' Exhibit 48.

In addition, the 1969 memorandum attached a sample letter to the various state agencies, presumably to be sent by the

District Engineers. The sample letter prescribed the form of assurance required of the state. *Id.* On November 24, 1969, the Director of the State of Hawaii's Department of Transportation prepared a letter to the District Engineer which gave the assurances of cooperation in the form required in the sample letter. This letter of assurance was forwarded to the Corps' Chief of Engineers by way of cover letters dated December 12, 1969 from both the Deputy Division Engineer and the District Engineer which stated that the requirements for satisfactory local assurances were now complete. Defendants' Exhibit 49.

The WRDA was enacted in 1974, P.L. 93–251. Section 80 of the Act, now codified at 42 U.S.C. § 1962d–17, is virtually identical in all relevant respects to the requirements specified in the earlier regulation issued by the Water Resources Council. While there is no reported legislative history of this Act, it appears that the relevant provision merely codified the earlier regulation. In any event, there was nothing further any state could have done to have a project qualify for the lower discount rate, since all action had to have taken place prior to the 1974 enactment date.

The "satisfactory assurances" referred to in Engineer Regulation 405–2–680, by its own terms, applies to those assurances that must be received *prior to the expenditure of funds for construction.* ER 405–2–680, ¶ 3. The assurances that must be received in this connection must be both substantial, detailed, and legally sufficient, so as to assure that the Corps will not be spending money before it is reasonably satisfied that the local agency has both the ability and the commitment to fulfill its concomitant obligations.

The quality of the assurances that must be received in connection with reports to Congress on the cost/benefit ratio of a project, however, need not be so rigorous, since both the cost/benefit ratio and the quality of the local assurances are subject to Congressional review, and further since the assurances are not directly related to the expenditure of funds by the Corps.

The timing outlined in the WRDA itself strongly supports the view that ER 405–2–680 should not be applied to the WRDA. Under the Act, the project must be authorized by January 3, 1969, and the assurances must be received by December 31, 1969, slightly less than 12 months later. It is unrealistic to expect that state agencies can move so quickly as to give the quality of assurances required in ER 405–2–680 in less than 12 months. As noted by the Corps in ER 1150–2–301 at ¶ 5.a., the process of simply establishing the sponsoring agency can take in excess of a year in many states. Other delays may be caused by approval of bond issues, securing rights of way, and the like. *Id.*

It is clear that the assurances under ER 405–2–608 are expected to be received only before funds can be spent by the Corps for construction. It is also clear that it is contemplated that such assurances in general could be not be given within a mere 12 months. In this regard, it is significant to note that, although the Barbers Point project was authorized in 1965, construction did not begin until May, 1982.

This court holds, therefore, that ER 405–2–680 does not apply to the assurances which must be received under the WRDA. In reaching this holding, the court is also influenced by the fact that the assurances sent by the State of Hawaii in this case are in the form specifically requested by the Corps, and were specifically requested in response to the regulation issued by the Water Resource Council which specified the conditions under which the 3¼ discount factor could be used.

 If the Regulation is held not to be applicable to this instant case, the question then becomes whether the matter is committed to agency discretion. One court has held that whether the assurances received were "satisfactory" is an objective test. *State of Alabama ex rel. Baxley v. Corps of Engineers,* 411 F.Supp. 1261 (N.D.Ala. 1976). This court concludes, however, that the WRDA is written in such broad terms that there is no "law to apply" here and that the matter is therefore committed to

**54**

agency discretion which is unreviewable by this court. *See, Johnston v. Davis,* 500 F.Supp. 1323, 1328 (D.Wyo.1980), subject, perhaps, only to the determination that the responsible official did in fact make the determination that the assurances were satisfactory, *EDF v. Marsh, supra.* Because that determination has in fact been made, this court concludes that the requirements of the WRDA have been met.

In addition, even if the decision of the Corps is reviewable, the standard of review is limited to whether the decision is arbitrary, capricious, or an abuse of discretion. *See, Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), discussed *infra.* Plaintiffs do not contend, nor is there any suggestion in the record, that the decision was "not in accordance with law", or without observance of "procedure required by law". *Id.*

In reviewing the record, there can be no doubt that the decision of the Corps was reasonable, and far from arbitrary or capricious. As noted in House Document 93 (Defendants' Exhibit 2), the State of Hawaii's Department of Transportation had in the past "more than met" all requirements of local cooperation. *Id.* at 73. The Corps reasonably and rationally concluded that the assurances given by the State on three separate occasions was sufficient for the purposes of the WRDA, especially when the last assurance was made in the precise form requested by the Corps.

For the reasons above given, the court must conclude that there has been no violation of the WRDA, and accordingly, the federal defendants' motion for summary judgment must be granted. Plaintiffs' motion for preliminary injunction is likewise denied for the above reasons.

In addition, even if the WRDA is somehow found to be violated, this court finds that the plaintiffs would not in any event suffer irreparable harm requiring any preliminary relief. While the Corps' regulations indicate that a project *may* be placed on "deferred" status if it is of "doubtful or marginal economic justification", ER 11–2–240, there has been no showing that this is what will in fact happen if a higher discount rate is mandated.

## V. THE ENDANGERED SPECIES ACT.

The Endangered Species Act of 1973, 16 U.S.C. 1531 *et seq.* ("ESA") became effective on December 28, 1973. Pursuant to the mandates of the Act, the U.S. Fish and Wildlife Service ("the Service") on June 16, 1976 proposed some 1700 plants for listing as endangered species. Although it was then thought to be extinct, the *Euphorbia skottsbergii* var. *kalaeloana* (hereinafter " 'akoko") was also included in this proposed list. 41 F.R. 24523–24572. The 'akoko plant is thought to be endemic only to the Hawaiian Islands. *See* Defendants' Exhibit 13 (the draft EIS), Appendix A–2.

In June—July of 1976, the plant was "rediscovered" in the vicinity of the Barbers Point harbor project site as a result of a vegetation study conducted in connection with studies for the proposed project. Letter from Cheung, Attached to Defendants' Exhibit 27.1 (October 19, 1976); Plaintiffs' Exhibit 25, Appendix B–2. Small populations and isolated individuals of the species were subsequently found in other nearby areas and on the Barbers Point Naval Air Station. Defendants' Exhibit 27, p. 1.

The final EIS, prepared by the Corps and dated July, 1976, acknowledges the presence of the 'akoko and the fact that it may be listed as endangered. The Corps stated that more intensive surveys of the habitat and adjacent areas will be conducted, and the evaluation of adequate protective and mitigative measures will be coordinated with the Service. The Corps considered the use of fencing to protect the plant from construction activity. Defendants' Exhibit 6, ¶ 4.24.

Because the 'akoko was listed as a proposed Endangered Species, the Corps also officially notified the Service of the discovery by letter dated October 19, 1976, attached to Defendants' Exhibit 27.1.

In its 1977 Supplement to the final EIS the Corps declared that the 'akoko "should

be considered fully protected by federal and state endangered species laws for planning purposes". Defendants' Exhibit 8, ¶ 4.04. Since the plants were not located in the harbor area but in the area to be developed by the State for the shoreside facilities, the state was given the primary responsibility for assuring that adequate preservation measures are instituted. Alternatives then discussed were to preserve the plants in a parcel of land set aside for that purpose, or to move the plant to a botanical garden. *Id.* This discussion was repeated by the Corps in its Design Memorandum No. 1, Phase II—Project Design, dated March, 1977. Defendants' Exhibit 8.

In 1978, the ESA was amended to require a federal agency to confer with the Service on any agency action likely to jeopardize the continued existence of a species *proposed* for listing. However, the agency was not prohibited from any irretrievable committment of resources pending this consultation. The provision is now designated as 16 U.S.C. § 1536(a)(4).

Notwithstanding the 1978 amendment, the Service was of the opinion that formal consultation with the Service was not required under the ESA, since the 'akoko had not yet been listed as either endangered or threatened. Nevertheless, the Corps on April 18, 1979, sought "informal" consultation since the plant was proposed for listing.

In the April 18, 1979 letter, the Corps noted that botanical field studies, as well as propagation and transplanting projects, had been undertaken to avoid long-term impact on the 'akoko. Because it was not able to formally consult with the Service, however, it was not provided with sufficiently detailed guidance as to whether the ongoing and proposed mitigation efforts were adequate to fulfill legal obligations should the plant be officially listed. The informal consultation was requested, therefore, in order to obtain some early guidance and thereby insure protection of the species while avoiding needless construction delays.

During this time, the Corps and the State of Hawaii commenced propagation and transplantation activities of the affected 'akoko. In September, 1977, some 360 plants were dug up and transported to a plant nursery. Although some 80% of the plants died over the next five months (due to borers), the remaining plants were found to be thriving, with seedlings sprouting in the vicinity. The propagation program was at that time found to be "encouraging". Letter from A. Cropper, Attached to Defendants' Exhibit 27.1 (October 30, 1978).

The Campbell Estate (the owner of the property) also conducted some transplantation activity in October of 1980 due to expansion of the quarry. In early, 1981, the survival rate of the transplants was originally estimated to be about 10% due to weeds and lack of proper supervision, but was later upgraded somewhat after the Kona rains. Memo from Elliot, Attached to Defendants' Exhibit 27.1 (January 19, 1981).

Unfortunately, the transplantation and propagation program ultimately proved to be generally unsuccessful. In formally listing the 'akoko as endangered, the Service concluded in 1982 that the conservation efforts then in effect did not effectively provide for the plants' survival, and that some of the efforts may in fact have contributed to the plant's decline. 47 F.R. 36847.

Shortly after July, 1979, the Corps hired a Winona Char, research biologist at the Honolulu Botanic Garden, to determine the habitat requirements of the 'akoko and to evaluate various techniques for nursery propagation and transplantation.

On September 18, 1979, the Service responded to the April 18, 1979 request of the Corps and issued a biological assessment. Although the 'akoko was found not to be in the harbor construction area and thus not affected by the actions of the Corps per se, the plant would be affected by the state's activities in the construction of the shoreside facilities. The activities of the state were therefore also included in the assessment.

The Service preliminarily concluded that the construction of the shoreside facilities would impact some 50–60 percent of the then known population of the 'akoko. The Service thus informally concluded that the Barbers Point project will likely jeopardize the 'akoko. The Service also concluded, however, that jeopardy could be avoided if a sufficient sanctuary for the plant could be established, and if the plant could be propagated and established in other suitable and secure areas. While the Service normally does not recommend transplantation or propagation of endangered plants, it concluded that such action was appropriate in the case of the 'akoko because the native habitat had been so greatly altered.

The success of the transplantation was to be measured by certain conditions specified in the letter. Plaintiffs complain that the Corps never gave official assurance that it would comply with the conditions. This court concludes, however, that such assurances were not required. First, the plant was not yet listed as endangered and thus there was no responsibility on the part of the Corps to follow these conditions. Second, it was implicit in the letter, of course, that if the transplantation was not successful and the 'akoko was officially listed as endangered, the plants remaining at the project site would be absolutely protected and would probably necessitate significant revisions or delays to the construction of the shoreside facilities. It was thus in the best interests of all concerned that the Corps make a determined effort to comply with the conditions stated.

On December 10, 1979, the Service withdrew its proposal to list the 'akoko as an endangered species because certain statutory time requirements imposed by the 1978 amendments to the ESA were not met. 45 F.R. 58166.

On September 2, 1980, the Service again proposed to list the 'akoko as an endangered species. 45 F.R. 58167. Because the plant was only proposed for listing, formal consultation with the Service was yet not required.

On September 29, 1981, Winona Char submitted her report to the Corps. She noted that some 5,245 of the plants were found in a restricted area of the Barbers Point Naval Air Station. Previously, only some 500 plants were thought to be in that particular area. Memo from Char, Attached to Defendants' Exhibit 27.1 (September 29, 1981). Because of this new finding, the Corps concluded that the harbor project would affect only some 7% of the then known plants, and would therefore no longer jeopardize the continued existence of the species. Memo from Elliot (October 6, 1981), and letter from Sprague (October 6, 1981), both attached to Defendants' Exhibit 27.1.

The Service on October 16, 1981 communicated to the Corps their concurrence with the opinion that the harbor project would no longer jeopardize the continued existence of the species, based upon the findings of Ms. Char. Letter from Administrator, Attached to Defendants' Exhibit 27.1 (October 16, 1981).

The 'akoko was for the first time formally listed as endangered on August 24, 1982. 47 F.R. 36846. The Corps on September 15, 1982 accordingly initiated formal consultation with the Service pursuant to the requirements in the ESA. By that time, the revised estimate was that less than 2% of the total plant population would be affected by the harbor project. Letter from Thiede, Attached to Defendants' Exhibit 27.1 (September 15, 1983).

On September 29, 1982, the Service issued its biological opinion, wherein the Service concluded:

> It is our biological opinion that the proposed project, both construction and operation, including currently planned appurtenant dock and shoreside support facilities, is not likely to jeopardize the continued existence of *Euphorbia skottsbergii* var. *kalaeloana.*

Letter from the Service, attached to Defendants' Exhibit 27.1 (September 29, 1982).

The Service noted that it had previously "informally" concluded in its biological as-

sessment that the project would jeopardize the species, but that opinion was subsequently reversed in another "informal" opinion (see previous discussion) because of the fact that more than 5,000 "dynamic, healthy, reproducing" new plants were found to be in the Barbers Point Naval Air Station, as opposed to the 500 previously thought to be in the area.

In its Biological Opinion the Service reaffirmed this latest conclusion. It reported that the total known population of the plants was now about 6,000. 500 of the plants were in various arboreta, and "several hundred" were located in a site maintained by the Campbell Estate. Of the 6,000 plants, only about 50 plants were expected to be affected by the harbor project.

The Service gave "special consideration" to the fact that the sizable population existing in the "healthy, reproducing condition" at the Naval Air Station was relatively well protected, since it was located in a very high security area with limited access and monitored closely for fire prevention. The existence of the other groups of plants in the various arboreta helped to reduce the risk of all plants being destroyed by fire, disease, vandalism or other negative factors. The Service then concluded that, since less than 2% of the known population of the 'akoko would be destroyed by the project, the percentage of loss would not be so great as to cause jeopardy to the species as a whole.

From the above discussion of the facts, this court can come to the following conclusions:

First, the Corps and all the parties concerned have from the outset treated the 'akoko plant as though it was on the endangered list, even though such a determination was not yet formally made, and that they have made concerted efforts to preserve the species, even though the law imposed no such obligation. It is true that such actions were for the most part unsuccessful, but there is no showing that those efforts were conducted either in bad faith or as a deliberate attempt to circumvent the ESA. The record indicates, in fact, that the transplantation efforts were conducted with care and under the supervision of experts such as Ms. Char. Moreover, even if a showing of bad faith could somehow be made, such actions would not violate any provision of the ESA, as discussed below, since the 'akoko was not under the protection of the Act.

Second, there has at no time been a violation of the ESA, either by the Corps or by the State, or by the Campbell Estate, and plaintiffs do not argue otherwise. The transplantation and propagation activities of the State and the Campbell Estate fall outside the scope of the ESA; the Act in all relevant respects is directed solely at federal agencies. The transplantation and other activities of the Corps prior to August 24, 1982 (when the species was officially listed as endangered) also fall outside the scope of the ESA, since the requirements and proscriptions of the Act apply only to species officially listed as either endangered or threatened.

Moreover, even if the ESA had applied to the activities of the Corps at that time, it is in any event not at all clear that such activities would violate the ESA, since the Corps was at the time working in consultation with, and following the recommendations of, the Fish and Wildlife Service.

Third, while there is some doubt as to the viability of the transplantation program, such transplantation is no longer being carried out, since it is clear that the need for the program has been obviated by the existence of a large population of the 'akoko in protected federal lands.

Under 16 U.S.C. § 1536(a)(2), the Corps is required to "insure" that any action it carries out "is not likely to jeopardize the continued existence of any endangered species" or "result in the destruction or modification" of the critical habitat of such species. In fulfilling this requirement, the Corps is required to use the "best scientific and commercial data available". *Id.*

Plaintiffs complain, however, that the Corps violated the ESA by continuing with

58

the project before a critical habitat was designated by the Secretary of the Interior. It should be noted at the outset that the plaintiffs properly are not seeking to force the Service to designate a critical habitat; since the Service is not a party to this suit, this court has no power to order the Service to review its decision. Plaintiffs instead argue that the Corps should not proceed with the project until the Service does designate the critical habitat. At the time it proposed the 'akoko for listing as endangered, the Service had concluded that no critical habitat could be specified. 45 F.R. 58167.

"Critical habitat" is defined in the ESA as:

(i) the specific areas within the geographical area occupied by the species, [at the time it is designated as an endangered species], on which are found those physical or biological features (I) *essential to the conservation of the species* and (II) which may *require special management considerations or protection;*

(ii) specific areas outside the geographical area occupied by the species [at the time it is designated as endangered], upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).

The law applicable at the time required that, "to the maximum extent prudent" a critical habitat was to be designated at the time the species is proposed for listing as endangered. In following this mandate, the Service noted that the 'akoko is no longer found in its natural habitat, and that, although it survives in non-native vegetation, "the greatly altered ecosystem in which it occurs cannot reasonably be said to be essential to its conservation". Accordingly, the Service concluded that no critical habitat could be specified. 45 F.R. 58167.

The Service reaffirmed this position on August 24, 1982, when it formally determined the 'akoko to be an endangered species:

The Service continues to believe that essential elements cannot presently be identified in the habitat occupied by the 'akoko. Should further study of its physical and biological requirements ... identify areas deemed essential to it's conservation, they may be designated as Critical Habitat.

47 F.R. 36848.

■ The standard of review of this decision is whether the decision 1) was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 2) failed to meet statutory, procedural, or constitutional requirements, or 3) because this decision was made pursuant to the rule-making provision of the Administrative Procedures Act, 5 U.S.C. § 553, it was not supported by substantial evidence. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

As to the first standard, the court must consider whether the decision was "based on a consideration of the relevant factors", and whether there has been a "clear error of judgment". Id. at 416, 91 S.Ct. at 824. Although the inquiry is to be "searching and careful", the court is not allowed to substitute its judgment for that of the agency. *Id.* As the Ninth Circuit stated:

This is a "highly deferential" standard of review which "presumes agency action to be valid," ... and which imposes upon petitioners the "heavy burden" of showing that the [agency] acted unreasonably ... In reviewing the challenged order we may not substitute our judgment for that of the [agency], ... and we must affirm if a rational basis for the agency's action is demonstrated. (citations omitted).

*Short Haul Survival Committee v. U.S.*, 572 F.2d 240, 244 (9th Cir.1978).

Further, the difference between the "arbitrary and capricious" test and the "substantial evidence" test is largely a semantic one, and "largely lacking in 'dispositional importance' ", *Id.* at 244.

This court has carefully examined the record and cannot conclude that the deci-

sion of the Service was either arbitrary or capricious, or not supported by substantial evidence. The 'akoko until just recently had been thought to be extinct. Significant numbers of the plant were subsequently found to be thriving in non-native vegetation. Each and every one of the physical and biological features in the area presently occupied by the species could not therefore reasonably be said to be essential in all its respects for the conservation of the species. Which of those features might in fact be considered "essential" could simply not be reasonably determined on the basis of the information known. This court cannot substitute its judgment for that of the Secretary, and can in no way find there to be a "clear error of judgment".

What is clear is that the decision was based upon all factors then known and, as far as the record indicates, is to this day known. The instant case is thus distinguishable from *Roosevelt Campobello Int'l Park v. U.S.E.P.A.*, 684 F.2d 1041 (1st Cir. 1982), which overturned the decision of the EPA allowing issuance of an oil refining permit, on the basis that the EPA did not consider all appropriate studies.

In *Roosevelt Campobello*, there were studies which could have been, but were not made. Plaintiffs have not been able to suggest in the instant case what further tests, studies, etc. could be done to establish a critical habitat. *Roosevelt* is also distinguishable because the decision challenged in that case was the determination that certain activity would not likely jeopardize two endangered species. The additional studies would have enabled the EPA to more accurately assess that risk. In the instant case, however, plaintiffs have given us no indication that there are additional studies which would be of any further use in assessing whether the loss of 2% of the total plant population would jeopardize the species, especially when the great bulk of the remaining plants are thriving in a protected area or in arboreta.

The main thrust of the plaintiffs' arguments seems to be complaining that actions of the Service are somehow "not in accordance with law", or have somehow "failed to meet statutory requirements". They argue that the critical habitat must be designated despite inadequate information. This interpretation is not supported by a careful reading of the ESA.

Plaintiffs have two arguments that there is an absolute duty to designate a critical habitat: 1) the Secretary's duty to conserve, and 2) the time requirements. Plaintiffs further argue that until this designation is made, all work on the project must cease, in order to avoid jeopardizing a potential critical habitat. This court rejects both arguments.

1) *Duty to conserve.* It has been declared to be the policy of Congress that "all Federal departments and agencies shall seek to conserve endangered species". 16 U.S.C. § 1531. "Conserve" has been defined to mean "to use all methods and procedures which are necessary to bring any endangered species ... to the point at which the measures provided pursuant to [the Endangered Species Act] are no longer necessary." 16 U.S.C. § 1532(3).

Plaintiffs argue that, by refusing to designate a critical habitat, the Service is not using "all" methods necessary to preserve the 'akoko. The federal defendants properly point out that the duty to conserve does not automatically translate into a duty to designate a critical habitat. With almost 6,000 plants thriving in areas unaffected by the harbor project, it would certainly not appear to be "necessary" that the Service designate a critical habitat at the present time.

2) *Time requirements.* At the time the Service made the determination that no critical habitat could be designated, the law required that, "to the maximum extent prudent", the critical habitat be designated at the time the species is proposed for listing as endangered. In 1982, the Congress amended this provision by requiring the designation "to the maximum extent prudent and determinable." *See* discussion *infra*).

It is true, as plaintiffs point out, that it was the intent of Congress that, except in

unusual situations, the critical habitat of the species be determined at the time it is proposed as endangered or threatened. House Report No. 95–1625, U.S.Code Cong. & Admin.News 1978, p. 9453. The Service in the instant case concluded that such a determination could not be made. The ESA does not in the instant case require that the Service make that determination on the basis of inadequate data.

The legislative history is supportive of this conclusion. Prior to 1978, there was no explicit requirement for the Secretary to designate a critical habitat at any time. In 1978, the Act was amended to require the Secretary of the Interior, "to the maximum extent prudent", to designate a critical habitat at the time the species is listed as endangered. P.L. 95–632, § 11. The quoted phrase was intended to give the Secretary the discretion to decide not to designate the critical habitat concurrently with the listing when "it would not be in the best interests of the species to do so". House Report No. 95–1625.

Finally, the amendments provided that the Secretary *may* establish critical habitats for those species for which no critical habitat had theretofore been established. P.L. 95–632, § 2.

In 1982 after the 'akoko was already listed as endangered, the Act was amended so that the Secretary was required to designate the critical habitat of the species at the time it is officially placed on the endangered or threatened list, "to the maximum extent prudent *and determinable*". P.L. 97–304, § 2 (now codified in 16 U.S.C. § 1533(a)(3) ).

The Act was further amended to place time limits on the designation of the Secretary: If the critical habitat is not determinable at the time the species is listed as endangered or threatened, the Secretary may have one more year to make the determination, and the determination *must* be made on the data then available, but only to the maximum extent *prudent*. P.L. 97–304, § 2 (now codified in 16 U.S.C. § 1533(b)(6)(C) ). The requirement to concurrently designate a critical habitat, how-

ever, would not apply to any species listed as endangered or threatened before November 10, 1978. *Id.* at § 2(b)(4).

Interestingly, the 1982 amendment also contained an exemption to the one year requirement noted above. The relevant section is as follows:

> any regulation proposed under section 4(f) of [the Endangered Species Act of 1973] (as in effect on such day [October 13, 1982] ) that is pending on such date of enactment under section 4(b) of such Act of 1973 [16 U.S.C. § 1533(b) ] (as amended by subsection (a) ); *and the procedural requirements specified in such section 4(b) (as so amended) regarding such petition or proposed regulation shall be deemed to be complied with to the extent that like requirements under such section 4 (as in effect before the date of the enactment of this Act) were complied with before such date of enactment.* (emphasis supplied)

P.L. 97–304, § 2(b)(1).

■ The court reads this language of the statute to require that any species whose listing as either endangered or threatened was still *pending* at the time of the enactment of the 1982 amendments was exempted from (i.e. "deemed to be in compliance with") the one year requirement, if the requirements applicable *prior* to the amendment were complied with. Thus, for such species, the Secretary still had a general duty (pursuant to the 1978 amendments) to designate the critical habitat at the time of the official listing of the species as either endangered or threatened. However, if the critical habitat for the species could not be determined at the time it is officially listed, such designation of the critical habitat need not be made within one year, as required by the 1982 amendment.

For those species which are officially *listed* at the date of enactment (as was the 'akoko), the 1982 amendments provide that the one year limitation would not be applicable. As noted in the statute:

> Any regulation proposed after, or pending on, the date of the enactment of this

Act to designate critical habitat for a species that was determined before such date of enactment to be endangered or threatened shall be subject to the procedures set forth in [16 U.S.C. § 1533], as amended by [the 1982 amendments] for regulations proposing *revisions* to critical habitat instead of those for regulations proposing the designation of critical habitat. (emphasis supplied)

P.L. 97–304 § 2(b)(2).

*Revisions* to the designation of a critical habitat, as opposed to the *original* designation of the critical habitat, are not subject to the one year limitation. 16 U.S.C. § 1533(a)(3)(B), as amended in 1982, provides that the Secretary:

to the maximum extent prudent *and determinable—*

. . . . .

(B) *may, from time-to-time* thereafter as appropriate, revise such designation [of critical habitat]. (emphasis supplied)

16 U.S.C. § 1533(a)(3)(B).

This interpretation is supported by the fact that the 1982 amendments did not change the provision enacted in 1978 which provides that the Secretary *may,* but is not required, to designate critical habitats where not previously done. 16 U.S.C. § 1532(5)(B).

Thus, read together, the amendments appear to have recognized that, prior to 1978, there was no duty at all to designate a critical habitat. With the 1978 amendments, the Secretary was required to designate a critical habitat, at the time it listed the species, unless it would not be in the best interests of the species. There was no requirement, however, that the critical habitat be designated if the information then available was not adequate to do so.

The 1982 amendments gave recognition to the fact that the critical habitat could not always be determined. Nevertheless, Congress required that the critical habitat be eventually (within one year) determined, even on the basis of inadequate data, if such data is the best that is then available. For those species *proposed* for listing at the date of the enactment of the 1982 amendments, the one year limitation would not apply, if the requirements applicable prior to 1982 were in compliance.

A fortiori, for those species already *listed* at the time of the enactment of the 1982 amendments (as was the 'akoko), the one year limitation period would also not be applicable. Therefore, the original designation of critical habitat, if it is made, would be governed by those procedures generally governing *revisions* to the critical habitat.

It is to be noted that the one year limitation period was enacted *after* the official listing of the 'akoko as endangered. Absent a clear indication of Congressional intent, this court would hesitate to give such a requirement a retroactive application.

■ Applying the law to the instant case, this court concludes that there is no requirement that the Service designate a critical habitat for the 'akoko on the basis of inadequate data. The Service had no duty to designate a critical habitat for the 'akoko at the time it was listed as endangered because the information available was insufficient to make the determination. Likewise, the Service had no duty to designate the critical habitat within one year, as provided in § 1533(b)(6)(B), because the provision is inapplicable to those species, such as the 'akoko, which were listed prior to the enactment of the 1982 amendments.

Perhaps the duty would exist by analogy in the situation where "the failure to designate the critical habitat will result in the extinction of the species." See 16 U.S.C. § 1533(b)(1)(B), enacted with the 1982 amendments, which allows the Secretary to exclude any area from the critical habitat if he determines that the benefits of such exclusion outweigh the benefits of including the area in the designation, unless the failure to designate such area will result in the extinction of the species. Such a situation clearly does not exist in the instant case.

In sum, this court rejects the plaintiffs' arguments that the Service not only had an absolute duty to designate a critical habitat, but also that all work must stop pending the determination of a critical habitat. There is no duty on the part of the Service to designate a critical habitat for the 'akoko plant, at least as long as the available information is inadequate to do so and the failure to do so does not endanger the species. In any event, it is clear that, whatever is the "critical habitat" of the plant, it does not include the construction site. The site would certainly not appear to be "essential" to the conservation of the species, given the fact that more than 6000 plants are thriving elsewhere.

■ Furthermore, even if such a duty is found to exist, there is no reason to enjoin construction activities at the project. The Fish and Wildlife Service has determined that there is no jeopardy to the continued existence of the 'akoko. This conclusion is reviewable, as discussed previously, under a rational basis test. Since the vast bulk of the plants are thriving in a protected area at the naval air station, and a significant number of other plants in the hands of arboreta, this court cannot find that the decision did not have a rational basis.

Plaintiffs argue the Service is somehow benefiting from the prior abuse and destruction of the plants in the area. As noted before, there was no "abuse". Further, even if those activities could have been prevented by the Service, there is little reason for this court to attach any significance to actions taken with respect to the plants prior to its listing in 1982 as an endangered species.

Plaintiffs' final argument is that the Corps has violated 16 U.S.C. § 1536(d), which prohibits the Corps from making "any irreversible or irretrievable commitment of resources" which has the effect of "foreclosing the formulation or implementation of any reasonable and prudent alternative measures" to protect endangered species.

■ This duty, however, exists only while the Corps is consulting with the Service. This duty is terminated when the consultation is terminated. As noted by Judge King in *Stop H-3 v. Lewis*, 538 F.Supp. 149 (D.Haw.1982), once the Service has issued its biological opinion (as it has done here), no further consultation is required.

In conclusion, this court can find no violation of the ESA, and accordingly must grant summary judgment in favor of the defendants.

## IV. COASTAL ZONE MANAGEMENT ACT.

The federal defendants have moved for summary judgment on the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.,* ("CZMA"). Plaintiffs claim under this Act that the federal and state defendants have failed to 1) "assure that the project is consistent with approved state management programs in accordance with properly approved criteria consistent with federal guidelines", and 2) "follow the procedures for certifying that the proposed project will comply with the state coastal zone management program and that such activity will be conducted in a manner consistent with that program". In addition, plaintiffs allege that defendant Kono has violated H.R.S. § 205A-26 by granting a Special Management Area permit in the coastal zone in spite of substantial adverse environmental and social impacts which impacts are not outweighed by a compelling public interest.

The CZMA requires in relevant part that: Each Federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state [coastal zone] management programs.

16 U.S.C. § 1456(c)(1).

Defendants first assert that the plaintiffs have no standing to bring an action under the CZMA. This issue was previously considered in connection with the defend-

ants' Motion to Dismiss, whereupon this court held that the defendants had failed to meet their burden of establishing the plaintiffs' lack of standing. Thus, while the plaintiffs' standing to bring an action under the CZMA is somewhat questionable, *see Town of North Hempstead v. Village of North Hills,* 482 F.Supp. 900 (E.D.N.Y. 1979), this court must continue to assume for the time being that the plaintiffs have standing under the CZMA and that a claim for relief can be stated by a private litigant.

 The federal defendants first argue that the federal consistency requirements do not apply to projects which were approved prior to the approval of the State's Coastal Zone Management Program. The plaintiffs' only response is that the federal defendants have failed to cite to any controlling authority for this proposition.

This court has reviewed the CZMA and the regulations promulgated thereunder, and finds that the federal defendants' arguments are dispositive on this issue. Under the regulations promulgated under the CZMA, a consistency determination is not required for development projects initiated prior to the approval of the State's coastal zone management program:

> A consistency determination will be required for ongoing Federal activities *other than development projects* ... initiated prior to management program approval.... (emphasis supplied)

15 C.F.R. § 930.38(a). The term "development project" is defined as follows:

> A Federal development project is a Federal activity involving the planning, construction, modification, or removal of public works, facilities, or other structures, and the acquisition, utilization, or disposal of land or water resources.

15 C.F.R. § 930.31(b).

There should be no question that the harbor project is a "development project" within the above definition. The critical question is whether the project was "initiated" prior to the approval of the state's management program. The state's Coastal Zone Management program was approved on September 19, 1978. The project, however, was planned and approved some two years previously, although construction began only in 1982. Nevertheless, it would seem that the project was "initiated" prior to the approval of the state's management program.

It does not seem likely that the Congress, in enacting the CZMA, intended that projects which were fully planned, budgeted and approved should be placed on hold or thrown into jeopardy on the basis of a state's management program which was only subsequently put into place. One can easily envision a situation, not unlike the instant case, where a federal agency has complied with the extensive procedures under NEPA, gone through the process of seeking Congressional authorization for the project, completed its studies, surveys and documentation for the project, gone through the bid process and selected a contractor, and then on the day before ground is broken be required to seek a consistency determination and risk having to go through the entire process again. Absent a clearer mandate from Congress, this court declines to impose such an interpretation on the CZMA.

This interpretation is consistent with 15 C.F.R. § 930.38(b), which provides that:

> A consistency determination shall be required for major, phased Federal development project decisions ... which are made following management program approval and are related to development projects initiated prior to program approval.... *This provision shall not apply to phased Federal decisions which were approved prior to management program approval (e.g. in a final environmental impact statement issued pursuant to the National Environmental Policy Act).* (emphasis supplied)

In addition, even if the consistency requirements were somehow to be found to apply to the harbor project, it is clear that those requirements were met in this instant case. Although the Corps took the position that the consistency requirements did not

apply to the harbor project, it nevertheless submitted a consistency determination for review by the state "in the spirit of the state's CZM program" Letter Attached to Federal Defendants' Exhibit 21 (December 21, 1978). By letter dated January 30, 1979, the State Department of Planning and Economic Development certified the Corp's consistency determination. Federal Defendants' Exhibit 21.

This would appear to fully comply with the procedures outlined in 15 C.F.R. § 930.-10 et seq. In any event, there can be no violation of the CZMA when the consistency determination is approved by the state, since the Corps is entitled to rely upon the state's agreement with the determination. Save Lake Washington v. Frank, 641 F.2d 1330 (9th Cir.1981).

Plaintiffs further argue that there have been changes made in the configuration of the coral disposal area III, and that a new consistency determination is required. They have cited to no authority in support of this proposition, and indeed, it would appear that this change would not rise to such a magnitude that a consistency determination is in fact required. There is certainly no authority cited or argument made to the court which suggests that the plaintiffs are entitled to an injunction pending a new consistency determination, even if one should be required.

Finally, plaintiffs argue that the project is not in compliance with the CZMA because it is in violation of the state's management program, which requires that the project be in compliance with zoning and other codes. Plaintiffs point to the fact that the defendants are stockpiling coral in excess of 50 feet, a violation of the Special Use Permit issued by the Planning Commission of the City and County of Honolulu.

The federal defendants point out that the permit was issued to the Campbell Estate, and that they are not bound by the restrictions in the Special Use Permit, since, under H.R.S. § 266, they are not required to even seek a permit. Furthermore, keeping in mind that the CZMA re-

quires conformity with state management programs only "to the maximum extent practicable", 16 U.S.C. § 1456, it is highly questionable that the stockpiling of the coral in excess of 50 feet, even if it is a violation of zoning codes, is of such a nature as to warrant a violation of the CZMA. It is certainly not sufficient to warrant injunctive relief.

## VII. FISH AND WILDLIFE COORDINATION ACT.

Plaintiffs' Eleventh Claim for Relief alleges that the federal defendants have failed to initiate or complete the consultation process prescribed under the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 et seq. (hereinafter FWCA), and have failed to adequately provide for the protection and conservation of wildlife resources, also in violation of the FWCA.

The record is clear that the Corps followed the consultation process required under the FWCA. The Fish and Wildlife Service was given a copy of the draft EIS, and, like other agencies, had the opportunity to comment on the project. These comments were included and considered by the Corps in the preparation of the final EIS. In addition, as demonstrated by letters attached to federal defendants' Exhibit 33, the Corps regularly consulted with both the Fish and Wildlife Service and its state counterpart.

Further, as noted by the court in EDF v. Froehlke, 473 F.2d 346, 356 (8th Cir.1972), if the Corps in good faith complies with the requirements of NEPA, it will automatically comply with the requirements of the FWCA. This court has already found the Corps to be in compliance with NEPA, and plaintiffs do not challenge the adequacy of the consultation process in the preparation of the EIS.

Plaintiffs virtually concede the above, and argue instead that the Corps was required to seek additional consultation when the dredging method was changed (i.e., to use blasting and the auger and clamshell). They have, however, offered no authority

in support of their position. Moreover, the Corps has already made a finding (which this court cannot disturb) that the change in the dredging method will not have a significant effect upon the environment, and thus that the consultation process under NEPA, among other things, need not be invoked. Given this finding, this court cannot see any reason to now hold that the change is significant enough to require consultation under the FWCA.

## VIII. NATIONAL HISTORIC PRESERVATION ACT.

■ Under the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.*, ("NHPA"), the Corps is required, prior to the approval of the expenditure of federal funds for a project, to:

> take into account the effect of the undertaking on any district, site, building, structure or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f.

Under the then applicable regulations issued under the NHPA, the Corps was first required to identify any property either included or eligible for inclusion in the National Register. 36 C.F.R. § 800.4(a) (1977). It must then, in consultation with the State Historic Preservation Officer, make a determination of effect upon any such property, in accordance with certain published criteria. 36 C.F.R. § 800.4(b). The project may proceed if the Corps makes the determination of no adverse effect and the Advisory Council on Historic Preservation does not object to the determination. 36 C.F.R. § 800.4(d).

In the final EIS, issued in July, 1976, the Corps noted that certain limited studies in the vicinity of the project were conducted by the Bishop Museum and others. It also discussed the results of a cultural reconnaissance study of the Barbers Point area in November of 1975, at the request of the Corps.

The final EIS noted that, although much of the area had been disturbed by various agricultural and industrial (quarrying) developments, various sites were identified in the study. The study recommended that as much knowledge as possible be obtained of the remaining sites. The study also recommended that more detailed studies be conducted for certain portions of the area, and the final EIS noted that such studies were underway and would be completed during the detailed design stages of the harbor planning. The final EIS noted that the intensive survey would determine whether any of the sites would be eligible for the National Register of Historic Places. *See* Federal Defendants' Exhibit 6.

In the Appendix to the final EIS are attached a letter from the Advisory Council, which determined that the EIS appeared adequate concerning compliance with the NHPA. Also attached is a letter from the State of Hawaii's Department of Land and Natural Resources, stating that the EIS "adequately addresses the concerns of this office and provides sufficient information for future evaluation".

On January 14, 1977, the Corps transmitted to the Advisory Council a copy of the report prepared by the Bishop Museum after it concluded the intensive Cultural Resources Survey study mentioned in the final EIS. In the transmittal letter, it was noted that the report concluded that the Barbers Point survey area was eligible for nomination to the National Register. Accordingly, the Corps stated that consultation with the State Historic Preservation Officer and the Advisory Council would be initated shortly for the purposes of developing a mutually agreeable plan for appropriate mitigation of adverse impacts on all sites affected by the harbor construction. Letter from the Corps to the Advisory Council, Attached to Federal Defendants' Exhibit 29a (January 14, 1977).

The Corps issued its 1977 Supplement to the final EIS, which was prepared in conjunction with Phase II post-authorization

detailed design studies. Federal Defendants' Exhibit 8. The 1977 Supplement contained an extensive discussion of the Bishop Museum's intensive Cultural Resources Survey study.

As noted in the supplement, additional sites were identified in the intensive study, and the significance of those sites and the materials found therein were discussed. The study apparently concluded that the Barbers Point area is archaeologically important and was eligible for nomination to the Historic Register. However, because the sites themselves were "not unusual or unique in Hawaii", the study concluded that their significance is primarily related to its research potential. Accordingly, the study recommended salvage of certain sites to be affected by the harbor project, instead of preservation of the sites themselves. Federal Defendants' Exhibit 8, p. 2. *See also*, Federal Defendants' Exhibit 9, Design Memorandum No. 1, Phase II—Project Design.

The supplement further stated that, in accordance with the requirements of the NHPA, evaluation of the federal and state actions were to be defined, and test excavation of certain selected sites were to be performed as mitigative measures prior to construction. *Id.*

Significantly, none of the sites recommended for additional studies were going to be directly affected by the federal harbor construction. Some of the sites, however, were close to the harbor limits, and the Corps stated that salvage of those sites as well as additional paleontological resource recovery within the area of federal construction activity would be performed prior to construction. *Id.*

For the lands to be affected by the shoreside facility development and the dredge material disposal areas, the Corps stated that the archaeological salvage and paleontological testing and recovery would be the responsibility of the state.

On February 24, 1977, the Corps informed the Advisory Council that it was proceeding with the understanding that the harbor site is eligible for nomination to the Historic Register. The letter noted that, although none of the identified sites were within the federal harbor project limits, about eleven (11) of those sites were close to the harbor boundaries. The Corps assured the Advisory Council that test excavation and/or salvage of those sites, in accordance with the recommendations of the Bishop Museum study, would be accomplished prior to any construction. Federal Defendants' Exhibit 29a.

On June 10, 1977, the National Park Service issued its formal determination that the Barbers Point area was eligible for inclusion in the National Register. Federal Defendants' Exhibit 29a.

It appears that, sometime in 1977, the Corps made a determination, in accordance with procedures required under the NHPA, that the excavation of the harbor would have no adverse effect on the affected area of the Barbers Point Harbor Archaeological District. The record is not clear as to exactly when this determination was made. What is clear, however, is that the State Historic Preservation Officer concurred in this determination by letter dated August 9, 1977. *Id.*

The Corps' determination of no adverse effect was transmitted to the Advisory Council on August 10, 1977. The basis for this determination is described in the letter:

a. The sites are primarily significant for the data they contain and their significance is realized with the retrieval of the data. The [Bishop Museum's study report] recommended eligibility based on this point and that 'The sites, in themselves, are not unusual or unique in Hawaii'. . . .

b. The Honolulu District [of the Corps] and the [State Historic Preservation Officer] have agreed:

(1) In-place preservation of sites is not necessary.

(2) The sites have minimal value as an in-place exhibit for public understanding and enjoyment.

(3) The sites are not known to have historic significance to a community, eth-

nic or social group that would be impaired by data retrieval.

(4) Present technology can retrieve the significant information.

c. Funds and time have been committed to adequately retrieve the data.

Corps' Letter to the Advisory Council, Attached to Federal Defendants' Exhibit 29a (August 10, 1977). *See also*, Letter from the State Historic Preservation Officer to the Corps (October 31, 1979), Attached as an Exhibit to Letter from the Corps to the Heritage Conservation and Recreation Service (November 8, 1979), in Federal Defendants' Exhibit 29a.

By letter dated August 29, 1977, the Advisory Council advised the Corps that it did not object to the Corps' determination of no adverse effect. Federal Defendants' Exhibit 29a.

On September 24, 1979, the Corps again requested comments from the State Historic Preservation Officer. This time, the Corps requested the state's concurrence of the Corps' determination that the aspect of the federal harbor construction project involving disposal of the dredged materials (as opposed to the excavation of the harbor itself) would have no adverse effect on the Barbers Point Archaeological District.

In addition, the Corps recommended that the current boundaries of the Barbers Point Archaeological District be expanded to include a contiguous area in the southeast, based upon a Bishop Museum survey. The State Historic Preservation Officer was asked to comment on the Corps' determination that the disposal of the dredged materials would have no adverse effect on this new area as well.

On October 31, 1979, the State Historic Preservation Officer issued its concurrence with the Corps' determination of no adverse effect, both for the sites currently eligible for listing on the National Register and those additional sites recommended by the Corps for determination of eligibility. The factors considered by both the State Historic Preservation Officer and the Corps in reaching this conclusion were very sim-

ilar to the reasons presented in the previous determination of no adverse effect:

1) The District is not a National Historic Landmark, A National Historic Site in non-federal ownership, or a property of national historic significance so designated within the National Park System.

2) The State Historic Preservation Plan does not require in-situ preservation of the property.

(a) The property has minimal value as an exhibit in sites for public understanding and enjoyment;

(b) Above and beyond its scientific value, the property is not known to have any historic or cultural significance to a community, ethnic or social groups that would be impaired by the retrieval of data;

(c) Current technology is such that significant information contained in the property can be retrieved;

(d) Funds and time have been committed to adequately retrieve the data.

Letter from the State Historic Preservation Officer to the Corps (October 31, 1979), Attached to the Corps' Letter (November 8, 1979), all included in the Federal Defendants' Exhibit 29a.

This latest determination of no adverse effect was forwarded to the Advisory Council, and on November 20, 1979, the Advisory Council informed the Corps that it did not object to the determination. Federal Defendants' Exhibit 29a.

In July 1981, a report was prepared for the Corps by the Archaeological Research Center Hawaii, Inc. (Federal Defendants' Exhibit 29e), which report is sometimes referred to as the Hammatt/Folk report. This report described the results of archaeological and paleontological investigations, testing and salvage excavations and data recovery in the project site.

Although the Hammatt/Folk report was approved by the Advisory Council, it was severely criticized by the Society for Hawaiian Archaeology in a letter to the Advisory Council, dated October 27, 1981. Federal Defendants' Exhibit 29a. In the letter, the Society described various peer reviews

of the report, and all of those reviews apparently generally concluded that the report was deficient in failing to meet the Federal Scope of Work or adequately addressing the Research Design. The Society therefore concluded that the report did not constitute adequate mitigation of adverse impact. The Advisory Council's response to those objections is enlightening:

> The data recovery was carried out under the terms of "No Adverse Effect" by the Corps of Engineers, which was based on the Council's old [guidelines].... The [Barbers Point] determination of No Adverse Effect, in which we concurred, included documentation indicating that the Corps had done a good job in designing the data recovery project and applying the [old guidelines], but did not provide for the Council to be afforded the opportunity to review reports. Subsequently, however, because the Corps itself was uncertain about the quality of the draft report submitted by Hammatt and Folk, the Corps asked for our review, and this was provided. The report was reviewed by Jane King, then a member of our Western Division Staff; Ms. King was highly critical of the report....

> The report was then revised, and the Corps again asked for our review.... [W]hile it was still ... a fairly poor product, Hammatt and Folk had technically and minimally met the criticisms that King had earlier provided.... The problem we then faced was this. The Corps was not legally obligated to do anything with respect to the report; the Corps had complied with our regulations, and hence with Section 106 of the National Historic Preservation Act. Out of its own sense of responsibility toward historic properties, the Corps had sought our review of the document, and had made a good-faith effort to obtain improvements in response to our comments.... To push for further changes would have interfered with the Corp's planning and caused the expenditure of more public money on activities which we felt we had no legal right to demand, given the restrictive nature of the original determina-

tion of No Adverse Effect. The Corps, in essense, would have been victimized by its own voluntary efforts to improve an admittedly bad product.

> It also appeared that some of the major arguments going on about the adequacy of the report went beyond our areas of authority, having to do largely with paleontological matters. Further, it appeared that at least some of the complaints stemmed from the laudable efforts of the Hawaiian archaeological community ... to generally cleanse and upgrade the quality of archaeological research under contract in your State. While these efforts are to be commended, and supported to the extent possible, we felt that the Corps could hardly be faulted for failing in the past to obtain contract work that elevates the state of the art.

> It seemed to us on balance best to indicate to the Corps that our criticisms had been essentially met, making it clear that under our regulations there was no legal basis for any project delays awaiting improvement of the report, while encouraging further review by a range of archaeologists in Hawaii in the hope that public exposure would result in improved projects in the future.

Federal Defendants' Exhibit 29a, Letter from the Advisory Council (November 27, 1981).

This court therefore concludes that the Corps has consulted with the various state and federal agencies involved in or interested in fulfilling the purposes of the NHPA. For each area in the Barbers Point Archaeological District to be affected by construction of the harbor, the Corps has made a determination of "no adverse effect", which determination in each instance has been concurred in by both the State Historic Preservation Officer and the Advisory Council.

The only criticism of the Corps' actions which can be found in the record at this point is the letter of October 27, 1981 from the Society for Hawaiian Archaeology. However, as noted by the Advisory Council

in its response, the Corps, under the then existing regulations, had no duty at all to submit the report to the Advisory Council for review; it did do so simply out of its sense of responsibility toward historic properties. After revisions suggested by the Advisory Council, the report was found to be "minimally" and "technically" acceptable. The Advisory Council felt that it could not demand further changes, since it would simply penalize the Corps for its voluntary efforts to improve its compliance under the NHPA.

Under these circumstances, this court cannot find that the Corps violated the NHPA in any way, and indeed the plaintiffs do not argue otherwise. In fact, as seen below, the plaintiffs' complaints regarding the NHPA all relate to events occurring after the above.

In the 1982 Environmental Assessment (Plaintiffs' Exhibit 22), it was noted that the project area had been formally listed in the National Register of Historic Places. As a result of various studies conducted in the area, many fossil bird remains, including those of many extinct species, as well as structural forms of various sizes, modified natural features, and site clusters were discovered. It was further noted that, except for two specified areas, all of the disposal sites and harbor basin area had been surveyed and appropriate data recovery completed.

For the remaining two areas, the Bishop Museum was requested to prepare a research design and proposal for the required archaeological and paleontological data recovery studies, in coordination with the State Historic Preservation Officer and the Advisory Council. Until the areas had been cleared from an archaeological standpoint, the construction contractor would not have access to either area. Plaintiffs' Exhibit 22, p. 6. In addition, the coral stockpile areas were to be cleared for data recovery prior to any disposal. *Id.*, at 8.

While the record appears somewhat incomplete at this point, it is clear that of the documents referenced in, and attached to, plaintiffs' Supplemental Memorandum in Opposition to Defendants Motion for Summary Judgment relate only to the last two areas mentioned above. Although those exhibits indicate that there is some dispute about the adequacy of the current studies, they are simply responses to the Corps' proposed determination of no adverse effect as to these areas, and as such, are simply part of an ongoing consultation process.

It appears that there has yet been no response from the Advisory Council regarding the Corps' proposed determination, and it would be premature for the court to consider at this point in time the question of whether the requirements of the NHPA have been met. In any event, the Corps has made it clear that the construction contractor will not have access to these areas "until the areas have been cleared from an archaeological standpoint". Plaintiffs' Exhibit 22, ¶ 2.3.

The record is undisputed that all the requirements of the NHPA and the regulations thereunder have been fully met. The Corps has repeatedly and consistently consulted not only with the Advisory Council, but also with the National Park Service and the State Historic Preservation Officer, throughout the planning and construction of the harbor project. Federal Defendants' Exhibit 29a.

After extensive studies were conducted, the Corps has concluded, for each area to be affected, that the project will have no adverse affect on property either included or eligible for inclusion in the National Historic Register. Except for the last determination, which is still subject to ongoing consultation, each of those conclusions were approved by the Advisory Council. Those determinations, of course, are judged by the "arbitrary and capricious" standard. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Short Haul Survival Committee v. U.S.*, 572 F.2d 240 (9th Cir.1978), and this court can find nothing to suggest that the decisions of the Corps or the Advisory Council were either arbitrary or capricious. As noted before, the only

evidence cited by the plaintiffs in support of their arguments that the requirements of the NHPA have not been met relate to an ongoing consultation process that is not yet complete and for which it would be premature for this court to review.

## IX. FAILURE TO MONITOR EFFECTS ON CULTURAL RESOURCES.

 In the Eighth Claim for Relief of their Second Amended Complaint, the plaintiffs allege that the Corps has violated the requirements in 33 C.F.R. § 230.13 in failing to produce adequate monitoring reports required under the regulation. The plaintiffs also allege that the Corps failed to follow adequate mitigation measures to protect cultural resources, or to coordinate its mitigation measures with the State Historic Preservation Office.

The federal defendants have moved for summary judgment as to this count. They rightly point out that, by its express terms, the reporting requirements of 33 C.F.R. § 230.13 does not apply to those projects for which a final EIS is on file as of July 30, 1979, except where environmental monitoring and/or authorized mitigation measures were underway or established in the final EIS. Since the final EIS in this case was filed in 1976, and since neither the final EIS nor the 1977 Supplement required monitoring of cultural resources, the requirements of the regulation are inapplicable to this case.

As to the allegations of inadequate mitigation methods, the record is clear, as noted above, that the Corps has engaged in extensive consultation and studies, as well as data recovery and salvage efforts, in an effort to preserve the information from the sites involved. These efforts have been approved by the Advisory Council on Historic Preservation prior to the start of construction activity affecting the area involved.

Plaintiffs appear to have conceded the above, since they have presented no argument or legal authorities to dispute the same. Summary judgment will be granted to the defendants on this point.

## X. MOTION TO SUPPLEMENT THE RECORD.

Plaintiffs have moved to supplement the record with daily inspection reports prepared for days following the hearing on the Motion for Preliminary Injunction. The state defendants object to this, arguing that the exhibits are irrelevant.

The exhibits are apparently offered by the plaintiffs to show that the 10 NTU standard established by the Corps (in place of requiring the specific cutterhead/suction method of dredging) is being violated. The suggestion, no doubt, is that the Corps is therefore unable to assure that the 10 NTU standard will be followed. The problem with the exhibits, however, as pointed out by the affidavit of Everette Flanders (attached to the state defendants' Memorandum in Opposition to Plaintiffs' Motion to Supplement the Record), is that most of the daily inspection reports relate to samples taken within the barge harbor itself, where the 10 NTU standard does not apply. The only exhibit showing a higher than 10 NTU reading in an area seaward of the barge harbor is Exhibit B, which shows a reading of 16 NTUs just north of the mouth of the harbor.

While it would seem highly unlikely that the plaintiffs could prevail on their NEPA claim on the basis of a singular reading in excess of the 10 NTU standard established by the Corps, and although the court has in the previous discussion already granted summary judgment to the defendants on the NEPA claim, the court will nevertheless allow the admission of this evidence, so as to allow the plaintiffs to perfect its record on appeal.

## XI. STATE DEFENDANTS' MOTION TO STRIKE.

The state defendants object to the late filing of the plaintiffs' Supplemental Memorandum in Opposition to Defendants' Motion for Summary Judgment. The memo comes in violation of this court's local rules, and even in violation of the stipulation of the parties regarding the filing of

memoranda, which stipulation gave the plaintiffs additional time for filing their opposition memoranda.

The state argues that the plaintiffs had ample notice that the federal defendants were preparing to file their Motion for Summary Judgment and therefore had ample time to prepare their opposition. The plaintiffs did not seek leave of court for the late filing.

The court notes first of all that the defendants have alleged no prejudice due to the late filing of the plaintiffs' memorandum. Indeed, the federal defendants have managed to file a reply memorandum, taking issue with virtually every argument raised in the plaintiffs' Supplemental Memorandum. Given the lack of prejudice to the parties, and this court's desire to be as fully briefed as possible when deciding substantive matters, the state defendants' Motion to Strike will be denied.

## XII. MOTION FOR RECONSIDERATION OF ORDER DENYING ADMISSION OF EVIDENCE.

Plaintiffs again seek to introduce into evidence a copy of a Bulletin from the Office of Environmental Quality Commission, an agency of the State of Hawaii. In the Bulletin, the public is solicited for input regarding the shoreside facilities being planned by the state, in connection with the preparation of a Supplemental EIS.

The court fails to see the relevance of this document to the issues in this case. As noted previously, the Corps had already expressed its intent to prepare a supplemental EIS when the state finalized its plans for the shoreside facilities. This Bulletin appears to be a step in that direction, and solicits from the public comments as to "alternative types, locations and construction phasing of shoreside facilities".

The proposed exhibit would in no way affect the determination made by this court earlier in this decision that a supplemental EIS would not be required until the state's plans for the shoreside facilities had been finalized. The exhibit is irrelevant to these proceedings, and plaintiffs' motion is therefore denied.

## XIII. CONCLUSION.

For the reasons stated above, IT IS HEREBY ORDERED as follows:

Plaintiffs' Motion for Preliminary Injunction is DENIED.

Plaintiffs' Motion for Summary Judgment is DENIED, and defendants' Motion for Summary Judgment is GRANTED as to all causes of action.

Plaintiffs' Motion to Supplement the Record is GRANTED.

State defendants' Motion to Strike the Plaintiffs' Supplemental Motion in Opposition to Defendants Motion for Summary Judgment is DENIED.

Plaintiffs' Motion for Reconsideration of Order Denying Admission of Evidence is DENIED.

JUDGMENT shall issue in favor of defendants on all causes of action.

IT IS SO ORDERED.